In the Matter of CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Debtor.

CMC HEARTLAND PARTNERS, Plaintiff–Appellant, Cross–Appellee,

v.

UNION PACIFIC RAILROAD, Defendant–Appellee, Cross–Appellant.

Nos. 92–3713, 92–3790.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1993.

Decided Aug. 18, 1993.

Raymond H. Groble, III (argued), Ross & Hardies, Chicago, IL, for Union Pacific R. Co.

Michael D. Dabertin, Robert Wheeler (argued), Oppenheimer, Wolff & Donnelly, Chicago, IL, for CMC Heartland Partners.

James M. Amend, Kirkland & Ellis, Chicago, Michael L. Gesas, Gesas, Pilati & Gesas, Chicago, IL, for Chicago, Milwaukee, St. Paul and Pacific R. Co.

Before COFFEY and MANION, Circuit Judges, and ALDISERT, Senior Circuit Judge.*

ALDISERT, Senior Circuit Judge.

We attempt again to reconcile the conflicting goals of environmental cleanup and a "fresh start" for bankruptcy debtors.

Presented in these cases, here and in other judicial circuits, is the important question whether debtors in bankruptcy who are charged with pollution in the past can be held liable for cleanup costs of hazardous waste at their former business sites.[1] Generally, demands for contribution and reimbursement are made after bankruptcy proceedings are either in advanced stages or have been completed; in these cases the debtors generally assert that the demands are too late because they were made subsequent to bar dates for claims fixed by the bankruptcy courts.

The interface of environmental cleanup laws and federal bankruptcy statutes is never tidy; jurisprudentially, it is somewhat grubby. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–9675 ("CERCLA") and similar state laws, like Washington's Model Toxics Control Act, Wash.Rev.Code ch. 70.105D ("the Model Act"), effective March 1, 1989, and predecessor statutes seek to protect public health and the environment by facilitating the cleanup of environmental contamination and imposing costs on the parties responsible for the pollution. The Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101–1330, and its predecessors were designed to give a debtor a fresh start by discharging as many of its debts as possible. The tension between these fundamental aspects of our national policy is profound.

The Supreme Court has indicated that, if possible, these two conflicting objectives should be reconciled. *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 505–06, 106 S.Ct. 755, 761–62, 88 L.Ed.2d 859 (1986); *see Ohio v. Kovacs*, 469 U.S. 274, 280–82, 105 S.Ct. 705, 708–09, 83 L.Ed.2d 649 (1985); *see also In re National Gypsum Co.*, 139 B.R. 397, 404 (N.D.Tex. 1992) ("It is not a question of which statute should be accorded primacy over the other, but rather what interaction between the two statutes serves most faithfully the policy objectives embodied in the two separate enactments of Congress"). The very difficult is-

* Ruggero J. Aldisert, of the Third Circuit, sitting by designation.

1. *See In re Jensen*, 995 F.2d 925 (9th Cir.1993); *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991); *In re National Gypsum Co.*, 139 B.R. 397 (N.D.Tex.1992); *United States v. Union Scrap & Metal*, 123 B.R. 831 (D.Minn.1990); *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986).

sue present in cases involving this fundamental conflict—including the case before us—is: When does a "claim" as defined by the Bankruptcy Act for recovery of cleanup costs arise?

## I.

The bankruptcy petition in this case was filed under the Bankruptcy Act of 1898. Section 77(b) of that act, former 11 U.S.C. § 205(b) (repealed 1978), provided: "The term 'claims' includes debts, whether liquidated or unliquidated, securities (other than stock and option warrants to subscribe to stock), liens, or other interests of whatever character." *See City of New York v. New York, N.H. & H. R.R.*, 344 U.S. 293, 295 n. 4, 73 S.Ct. 299, 300 n. 4, 97 L.Ed. 333 (1953). The current version of the code sets out the broad reach of the term in greater detail. "Claim" means:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

When a kindred contention was previously before us in *In re Chicago, Milwaukee, St. Paul & Pacific Railroad*, 974 F.2d 775 (7th Cir.1992) (hereinafter *Chicago I*), we announced a possible formulation of when a contingent claim arose:

[W]hen a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which the potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim under Section 77.

*Id.* at 786. Our formulation has been cited with approval by the Court of Appeals for the Ninth Circuit. *In re Jensen*, 995 F.2d 925 (9th Cir.1993).

We have cross appeals filed by Union Pacific Railroad and by CMC Heartland Partners, the successor in interest to the debtor, Chicago, Milwaukee, St. Paul & Pacific Railroad (hereinafter "the Milwaukee Road"). Our task is to determine whether the district court properly applied our definition of a contingent claim to that submitted by Union Pacific Railroad for contribution and indemnity. Union Pacific purchased the property at issue from the Milwaukee Road bankruptcy trustee by agreement dated March 28, 1980. The agreement included a clause by which the bankruptcy trustee and the Milwaukee Road agreed to indemnify Union Pacific and its subsidiaries—

against any and all claims, damages, liabilities, losses or demands whatsoever, and expenses in connection therewith, including reasonable fees of outside counsel, regardless of the source or nature thereof, arising out of the operation of the Properties prior to March 12, 1980.

App. at 49.

Union Pacific now faces liability under state and federal law for cleanup of pollution on the property and seeks to enforce the indemnification clause against CMC. CMC responds that any claims for cleanup costs were discharged in the bankruptcy proceedings.

In these cross appeals, we must consider (1) whether the district court was correct in holding that Union Pacific's claim for indemnification of its liability under federal law arose before the discharge and thus was barred; and (2) whether the district court was correct in holding that Union Pacific's claim for indemnification of its liability under state law arose after the discharge and thus was not barred.

Jurisdiction was proper in the trial court based on 28 U.S.C. § 1334. This court has jurisdiction under 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(a) of the Federal Rules of Appellate Procedure.

We hold that the district court properly held that Union Pacific's claim under CERCLA was barred. To the extent that the district court further held that Union Pacific's claim under the Washington Model Toxic Control Act was not barred, we vacate that portion of the judgment and remand with a direction that the district court first determine what liabilities under the Model Act, if any, were imposed under previous Washington statutes, and then decide what, if any, specific cleanup liabilities under previous state statutes were discharged because no claims were timely presented to the bankruptcy court.

## II.

The Milwaukee Road petitioned for reorganization on December 19, 1977, under Section 77 of the Bankruptcy Act of 1898, which was then in effect. Union Pacific was a creditor and participated in the bankruptcy proceedings.

On July 12, 1985, the district court entered Order No. 832, which confirmed the debtor's reorganization plan. The order set a bar date of September 10, 1985, for all postpetition claims. Claims arising after September 10 but before the consummation date of November 25, 1985, were required to be filed by December 26, 1985. Under Section 11.2 of the plan, the bar dates apply to—

> all claims, including claims for contribution and indemnity existing as of the Confirmation Date [July 12, 1985] and Consummation Date [November 25, 1985], respectively. The bar dates provided in section 11.1, however, do not apply to claims for contribution or indemnity based on facts that are unknown, undisclosed and unasserted as of the Confirmation Date and Consummation Date, respectively.

App. at 23. The court subsequently entered Order No. 866 on November 12, 1985 ("the consummation order"), which discharged all claims against the Milwaukee Road and its successors and assigns, including CMC, unless those claims had been timely filed. The order also enjoined all persons from asserting claims that had been discharged.

The property giving rise to Union Pacific's claim is a former railyard in Tacoma, Washington ("the railyard"), which had been owned by the Milwaukee Road from the early years of this century. The railyard is located within the Commencement Bay/Nearshore Tideflats Superfund site in Tacoma, Washington ("the Superfund site"), a site whose characterization, remediation and funding were described in numerous national and regional newspapers as early as 1981. The bankruptcy trustee conveyed it to Union Pacific by quitclaim deed, and it was subsequently assigned to the Oregon–Washington Railroad and Navigation Co., a wholly owned subsidiary of Union Pacific. The transfer was authorized by the reorganization court and took place on December 19, 1980.

Union Pacific removed the existing structures on the railyard, and it thereafter stood vacant. By April 1980, Union Pacific engineers had inspected the site and reported their results in an internal memorandum to Roland Haacke, the company's district engineer. The memorandum included this statement:

> Diesel fueling area is oil saturated and will probably require removal of surface oil as well as contaminated dirt. Apparently, this covers quite a large area and may require extensive clean-up.

Rec. 4, Ex. J–1. Haacke testified that he made several personal inspections of the railyard and observed oil or grease on the ground in the shop area, the roundhouse area and the diesel fueling area. Union Pacific contends that the inspections by Haacke and others gave no indication of any subsurface contamination but revealed only surface contamination.

Meanwhile, hazardous wastes in the area around the railyard came to the attention of the Environmental Protection Agency. EPA placed Commencement Bay and the Nearshore Tideflats on the Interim Priority List in October 1981. In this same highly publicized announcement, EPA described the Superfund site as one of the ten most hazardous sites in the country. Local and national media reported these developments. Rec. 3, Ex. H; *see also* Wallace Turner, *Tacoma Pollution on "10 Worst" List,* N.Y. Times,

Nov. 8, 1981, § 1, at 35. The Union Pacific railyard is entirely within the Superfund site. The proposed inclusion of the Commencement Bay/Nearshore Tideflats area on the first National Priorities List (NPL) was published in the Federal Register. Amendment to National Oil and Hazardous Substance Contingency Plan; The Nation Priorities List, 47 Fed.Reg. 58476 (1982) (proposed Dec. 30, 1982). The site eventually was included on the first NPL, which was issued in September 1983.

The state of Washington commissioned an environmental study of the railyard, focusing on its historical use. The study, by Dames & Moore, was completed in January 1982 and included these findings:

> During the history of the railyard, many spills of compounds occurred on site, including oil and other compounds transported by rail. Spills were not cleaned up, and the materials were allowed to seep into the ground.
>
> The railroad also cleaned out their rail cars. It was reported that during the late 1950s the material was dumped on site and allowed to disperse into the soil and seep into the waterways. In 1960, the railroad was required to collect copper sulfite and other toxic materials dry and dispose of them on land. Runoff from this site enters the Milwaukee Waterway.
>
> This evaluation of the site indicates that the soils at this site are possibly permeated with toxic compounds. Recently, there has been some grading and the tracks were pulled up. This may have resulted in covering the permeated soils with a thin layer of dirt or exposing the contaminated soils to the environment.

Rec. 4, Ex. G, at 50. The Dames & Moore study was delivered to the Washington Department of Ecology. Union Pacific states that it did not receive a copy of the study and was not aware of its contents.

Union Pacific owned other property within the Superfund site and had dealings with EPA and the state in connection with two of these properties. EPA found contamination in the vicinity of an abandoned railway tunnel owned by Union Pacific and notified Union Pacific in early 1982 that it was a poten-

tially responsible party. However, EPA determined that the tunnel was not the source of the contamination and discontinued its investigations. Union Pacific interpreted this to mean that it would not be required to participate in the cleanup of the Superfund site.

The state's ecology department also contacted Union Pacific about oil contamination that occurred in the City of Tacoma waterway on February 16, 1982. The source of the spill was determined to be Union Pacific's Tacoma fueling facility, located several miles from the railyard with which the present case is concerned. Under the state's Water Pollution Control Act, Union Pacific was required to take remedial action and then commissioned a groundwater investigation. Although the investigation revealed no groundwater contamination, Union Pacific proposed to remove the top one-foot of soil at the facility to "eliminate the possibility of any diesel fuel in such soil reaching the storm drains or groundwater." The soil was removed, and the state approved this action.

Finally, in August 1985, several months before the bar dates, EPA completed a Remedial Investigation of the Superfund site. This investigation contained a reference to environmental contamination at the railyard:

> Milwaukee Railroad was located on the south shore of Sitcum Waterway until 1980. According to Dames & Moore (1982), numerous solid and liquid spills have occurred in this area. The contents of these spills are unknown and the associated potential for release of contaminants to Sitcum Waterway from the spills and railway operations cannot be evaluated.

Union Pacific Br. at 10.

Union Pacific later decided to sell the railyard and commissioned an environmental audit that was completed by Applied Geotechnology on June 29, 1990, and disclosed subsurface contamination consisting primarily of petroleum hydrocarbons. The audit also identified potential contamination from metals and solvents. Union Pacific notified both EPA and the state of these findings but contends that it did not know of any subsur-

face contamination prior to this environmental audit.

The state ecology department notified Union Pacific on October 16, 1990, that the railroad was potentially liable under the Washington Model Act. Union Pacific and the state then entered into an agreement on July 31, 1990, providing for remediation of contamination at the railyard under the act. CMC asserts also that on April 24, 1989, EPA notified Union Pacific that it was a potentially responsible party under CERCLA and thus could be liable for cleanup costs at the railyard.

Union Pacific served CMC on September 9, 1991, with a demand for settlement negotiations concerning cleanup of the railyard. CMC filed a motion in the district court for the Northern District of Illinois to enjoin Union Pacific, pursuant to the consummation order, from asserting any claims arising out of the purchase of the railyard. Union Pacific subsequently filed a complaint in the district court for the Western District of Washington, seeking declaratory judgment and contribution and asserting claims under the Model Act and CERCLA.

### III.

After reviewing the facts, the district court for the Northern District of Illinois considered whether Union Pacific knew of its potential liability under CERCLA and the Model Act before September 10, 1985, the bar date for post-petition claims. *In re Chicago, M., St. P. & Pac. R.R.*, No. 77 B 8999, 1992 WL 316321 (N.D.Ill. Oct. 21, 1992) (hereinafter "D.Ct.Op."). The court concluded that Union Pacific had constructive knowledge of its CERCLA claim by the bar date and identified several facts that supported its determination:

- The Commencement Bay and Nearshore Tideflats area was identified in 1981 as one of the most contaminated places in the country. D.Ct.Op. at 7. The railyard is included in this area.
- Union Pacific officials denied that they knew of the 1982 Dames & Moore report, but "this information was available had they sought it out." *Id.*

- EPA's notice to Union Pacific in 1982 concerning possible contamination from the railway tunnel "was direct notice to Union Pacific that there were environmental investigations occurring in the Commencement Bay Area." *Id.*
- Union Pacific knew in 1982 of spills at its Tacoma fueling facility, which made the railroad liable for cleanup costs under state law. *Id.*
- Union Pacific's own engineers had inspected the railyard in 1980 and noted that the site "may require extensive cleanup." *Id.* at 8.

The court stated:

While Union Pacific may not have had actual knowledge of hazardous waste contamination at the railyard, the facts reveal there was enough information present at the time that the bar dates went into effect that Union Pacific should have been aware of its potential liability.... The presence of a number of environmental investigations by state and federal authorities in the Commencement Bay area should have reasonably alerted Union Pacific to the possibility of environmental contamination of an area that was already found to be oil saturated. Enough factual information exists to give Union Pacific constructive knowledge of a CERCLA claim at the time of the bar dates.

*Id.* at 7, 8.

The district court then turned to Union Pacific's claim for indemnity of costs relating to the Model Act and held that this claim was not barred. The court noted that the consummation order was filed in 1985, before the Model Act took effect on March 1, 1989. The court concluded, "Union Pacific could not possibly have known of its liability under a statute that was not in existence until four years after the bar dates were established for filing claims against the Milwaukee Road." *Id.* at 9 (citing *In re Penn Central Transp. Co.*, 944 F.2d 164, 167–68 (3d Cir. 1991) (CERCLA claim was not discharged in bankruptcy when consummation order was entered before CERCLA was enacted), *cert. denied sub nom. Penn Central Corp. v. United States*, —— U.S. ——, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992)). The court also rejected

CMC's implicit argument that CERCLA preempted state law remedies for hazardous waste contamination. *Id.* at 8.

## IV.

Union Pacific argues that the district court erred in determining that Union Pacific had constructive knowledge of its CERCLA liability before the consummation date. CMC argues that the district court erred in determining that Union Pacific could not have known of its state law liabilities until after the consummation order was filed; it asserts that the Model Act did not create new duties but merely recodified existing duties under the state's Water Pollution Control Act, Wash.Rev.Code ch. 90.48, and Hazardous Waste Management Act, Wash.Rev.Code ch. 70.105, and accompanying regulations, Wash.Admin.Code ch. 173–303.

▮ We described the standard of review in *Chicago I:*

> Because the district court's entry of an injunction in this case was both a bankruptcy decision and an interpretation of its prior consummation order, we review the court's decision to bar [the creditor's] claims for abuse of discretion. Nonetheless, in applying the abuse of discretion standard, we do not give equal deference to every aspect of a court's decision. The abuse of discretion standard is used to evaluate the reorganization court's application of the facts to the appropriate legal standard, and the factual findings and legal conclusions underlying such decisions are evaluated under the clearly erroneous and *de novo* standards, respectively.

974 F.2d at 779–80.

## V.

▮ Our analysis must begin with the definition of a "claim" under the Bankruptcy Act of 1898. We have recognized that Section 77(b) of the Act "broadly defines claims to include 'debts, whether liquidated or unliquidated ... or other interests of whatever character.'" *Chicago I,* 974 F.2d at 780 (quoting former 11 U.S.C. § 205(b) (repealed 1978)).

Union Pacific argues that it did not have sufficient knowledge of its CERCLA liability prior to the consummation date to require it to file a proof of claim. In *Chicago I,* the Washington State Department of Transportation (WSDOT) purchased property from the bankruptcy trustee in 1984. The state's Department of Ecology determined by June or July 1985 that the site was contaminated as a result of a 1979 derailment and spill of copper ore. In August 1985, the Department of Ecology notified WSDOT of the problem and indicated that some tests had been completed and further testing would be necessary. Soil samples were taken in October 1985, and test results were returned in November.

WSDOT did not file a proof of claim before the second bar date of December 26, 1985. The state subsequently sought to recover cleanup costs incurred under CERCLA. The district court held that the claim was barred, and we affirmed.

As previously set forth in detail in Part III, the district court in the present case listed five significant facts indicating that Union Pacific had sufficient knowledge of its potential liability under CERCLA to require it to file a proof of claim. In summary, the court found that the railyard was included in a Superfund site; the Dames & Moore report described contamination at the railyard, a report described by the district court as information that was available to Union Pacific "had they sought it out"; Union Pacific knew of EPA investigations in the area; it knew of its liability under state law for contamination at the Tacoma fueling facility; and its own engineers had noted that the railyard might require extensive cleanup. The court held that Union Pacific had constructive knowledge of its CERCLA claim.

Union Pacific presents a number of counterarguments that essentially challenge the district court's factual finding of constructive knowledge. It argues that it did not anticipate CERCLA liability because petroleum is specifically exempted from coverage. 42 U.S.C. § 9601(14) ("The term ['hazardous substance'] does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or

designated as a hazardous substance...."). *But see* 50 Fed.Reg. 13,460 (April 4, 1985) (commentary to final rulemaking) ("EPA does not consider materials such as waste oil to which listed CERCLA substances have been added to be within the petroleum exclusion.").

Although the district court determined that "Union Pacific may not have had actual knowledge of hazardous waste containers at the railyard," on the basis of the record before it, the court could have found actual knowledge as well. The April 1, 1980 in-house engineers' memorandum, prepared shortly after the purchase agreement was entered into, stated that a portion of the railyard "will probably require removal of surface oil as well as contaminated dirt. Apparently, this covers quite a large area and may require extensive clean-up." Although at oral argument, Union Pacific explained that this memorandum "pertained solely to surface spills," its district engineer had testified to seeing "oil on the surface, grease or oil, fuel" on the site. One does not need an engineering degree to conclude that grease, oil and fuel left standing for a long period of time have the capacity to seep into the subsurface of soil. This was *five years* before the bar date.

In any event, the district court did not err in finding constructive knowledge. With EPA conducting a massive investigation of one of the ten most hazardous sites in the country, in which the railyard was located, Union Pacific cannot now argue that it did not know of potential environmental claims regarding the railyard. Our national environmental policy does not permit a commercial landowner in a tainted area to put on blinders or attempt an "ostrich defense."

We are satisfied that the district court's determination that Union Pacific had constructive knowledge of the facts summarized above was not clearly erroneous. From this we conclude that when such knowledge was imputed to Union Pacific, it became "a potential CERCLA claimant [who could] tie the bankruptcy debtor to a known release of a hazardous substance." *Chicago I*, 974 F.2d

at 786. We also conclude that on the basis of the Dames & Moore study, the April 1980 inspection of the railyard by Union Pacific engineers, the personal inspections by district engineer Haacke, the public characterization by the EPA of the Commencement Bay area as one of the ten most hazardous sites in the country and other evidence, it can be said, paraphrasing *Chicago I*, that Union Pacific was a potential claimant that had, in fact, made inspections of the site and observed contamination and had available similar information from other sources, and therefore Union Pacific had at least a contingent CERCLA claim under Section 77. *See id.* We conclude further that Union Pacific had this contingent CERCLA claim substantially in advance of the bankruptcy court's bar dates of September 10, 1985 and December 26, 1985.

We hold, therefore, that the district court did not abuse its discretion to bar Union Pacific's CERCLA claims.

In so deciding, we are not pursuing "mechanical jurisprudence" in the sense condemned by Roscoe Pound [2] by requiring fealty to bar dates set by bankruptcy judges. We are not vaunting the national bankruptcy policy over environmental concerns. If anything, we are acknowledging the importance of facilitating the cleanup of environmental contamination by placing upon property owners—whether longtime owners or new purchasers—the obligation of performing an environmental audit as early as possible. It is not too much to require a timely examination under any circumstances, but where a present owner expects reimbursement from a predecessor in interest, any delay may preclude relief, because of the intervention of a statute of limitations, or as here, the interposition of dates barring claims imposed by bankruptcy courts.

## VI.

█ We now turn to CMC's appeal challenging the district court's determination that Union Pacific's claim under the Model Toxics Control Act was not barred, because

---

**2.** Roscoe Pound, *Mechanical Jurisprudence*, 8 Colum.L.Rev. 605 (1908), *reprinted in part in*

Ruggero J. Aldisert, *The Judicial Process* 304 (1976).

the Model Act did not go into effect until after the 1985 bar dates. CMC acknowledges that the Model Act went into effect after the bar dates and that several courts have held that claims based on a statute enacted after discharge in bankruptcy are not barred. *E.g., Penn Central*, 944 F.2d at 168. CMC distinguishes these cases by asserting, "Union Pacific was aware of existing liabilities to the United States and the State of Washington for clean-up of the Railyard Site, under both CERCLA and existing Washington State statutes." CMC Br. at 24. CMC relies on the state Water Pollution Control Act, Wash.Rev.Code ch. 90.48, and on the Hazardous Waste Management Act, Wash.Rev.Code ch. 70.105, with its accompanying regulations, Wash.Admin.Code. ch. 173–303. These enactments were in effect in 1985, prior to the adoption of the Model Act. Union Pacific vigorously argues that it had no liability under the laws existing in 1985 and that the Model Act imposed an entirely new species of liability.

We will not meet the question at this time as to what liabilities under the Model Act existed in 1985 by virtue of Washington state statutes then in effect. The district court did not make findings in this respect, and we will remand these proceedings to that court to make this determination in the first instance.

It is suggested that upon remand the parties assist the court by preparing a section-by-section comparison of the Model Act with previously enacted relevant state statutes. Such an analysis could indicate whether a particular type of liability under the Model Act existed under predecessor statutes prior to the bar dates, and whether Union Pacific consequently had a contingent claim for environmental cleanup costs under Washington statutes in effect before the bar dates.

The judgment of the district court is AF-FIRMED in part and VACATED in part and the cause REMANDED for further proceedings in accordance with the foregoing.