AM INTERNATIONAL, INC., Plaintiff–Appellant,

v.

DATACARD CORPORATION, DBS, Inc., Addressograph Farrington, Inc., Defendants–Appellees.

No. 96–1621.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1996.

Decided Feb. 11, 1997.

Lewis S. Rosenbloom, Jerome B. Meites, Jonathan M. Cyrluk, McDermott, Will & Emery, Chicago, IL, John W. Watson, Michael E. Barry (argued), Roberta M. Saielli, Richard J. Kissel, Gardner, Carton & Douglas, Chicago, IL, for Plaintiff–Appellant.

John W. Costello, W. Scott Nehs, Wildman, Harrold, Allen & Dixon, Chicago, IL, Michael J. Wahoske (argued), B. Andrew Brown, Dorsey & Whitney, Minneapolis, MN, for Defendants–Appellees.

Before RIPPLE, DIANE P. WOOD, and EVANS, Circuit Judges.

EVANS, Circuit Judge.

For nearly 25 years, AM International (AMI) spilled hazardous chemicals at an industrial site in Holmesville, Ohio. This case involves the claims of a subsequent purchaser of the site, Datacard Corporation, arising out of the site's cleanup. Before the district court, AMI argued that its liability had been discharged in bankruptcy. The court disagreed and awarded Datacard response costs, an injunction requiring AMI to perform the cleanup, and attorney fees. As we'll explain below, we affirm the award of response costs and the injunction, but reverse the award of attorney fees. First, the facts.

From 1959 to 1981 AMI housed two of its divisions, Multigraphics and Addressograph, at the Holmesville site. On part of the site Multigraphics operated a "tank farm." The farm consisted of nine tanks ranging in capacity from 6,000 to 8,000 gallons. Multigraphics used the tanks to mix tetrachloroethylene (TTE) with naphtha to produce "Blankrola," a cleaning solvent. When mixing the chemicals, Multigraphics' employees sometimes spilled a little. Sometimes they spilled a lot. In 1971, for example, an employee named Ron Proper didn't exactly live up to his name. Instead, Mr. Proper failed to properly close a valve, a misstep that allowed thousands of gallons of Blankrola to pour onto the ground.

In November 1981 AMI sold the site and Addressograph to a company called DBS, Inc. In order to allow Multigraphics to continue producing Blankrola in Holmesville, however, AMI retained ownership of the tanks and leased the tank farm grounds back from DBS. When AMI sold Addressograph,

many of AMI's employees, including Ron Proper, jumped ship and signed on with DBS. Five months later, in April 1982, AMI petitioned for reorganization under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, in the Northern District of Illinois. During and after the bankruptcy, which was confirmed in September 1984, AMI continued to mix—and spill—TTE, naphtha, and Blankrola. In May 1985, AMI finally put the lid on its tank farm operations.

About a year later, Datacard entered the picture. Datacard planned to buy DBS and, as part of its due diligence, conducted an environmental audit of the Holmesville site. The audit turned up soil contamination and a layer of Blankrola at least 12 inches thick floating on the groundwater. Despite the find, Datacard went ahead with the purchase, figuring it had a good shot at recovering its cleanup costs from AMI and that the cleanup would only run about $350,000—small change in comparison to the $52 million it was shelling out to buy DBS.

After completing the purchase, Datacard syphoned the Blankrola off of the groundwater and gave AMI, the State of Ohio, and the EPA notice that it planned to sue for its response costs and an injunction ordering AMI to clean up its own mess. After receiving this notice, AMI raced back to the federal courthouse for the Northern District of Illinois and sought a judgment declaring that Datacard's claims had been discharged in bankruptcy. In turn, Datacard filed counterclaims against AMI, requesting damages and injunctive relief under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 *et seq.*, and state common law. In 1992, the district court granted summary judgment for AMI on the state law claims but denied it on the CERCLA and RCRA claims. Among other things, the court found that a genuine issue of material fact existed as to whether DBS had sufficient information to give rise to a CERCLA claim before AMI's bankruptcy was confirmed in 1984. AMI cried foul and moved to reopen discovery, arguing the "sufficient information" standard applied by the

district court was a substantial departure from established precedent. Sensing AMI was merely trying to fine tune over 4 years of discovery, the court denied the request.

In 1993, with the Illinois case almost 6 years old and still pending, AMI found itself back in troubled financial waters and once again petitioned for reorganization in bankruptcy, this time in Delaware. In an effort to liquidate Datacard's claims, the Delaware bankruptcy court lifted the automatic stay and gave the green light for the Illinois case to go to trial. After a 3-day bench trial AMI filed its post-trial brief, requesting that Datacard's claims be disallowed under § 502(e)(1)(B) of the Bankruptcy Code. The district court struck that portion of the brief, finding that the Delaware court retained exclusive jurisdiction on the allowance of claims and that AMI waived the affirmative defense of disallowance by failing to raise it before— or even during—the trial.

In September 1994 the district court entered judgment for Datacard and, with a few minor changes, adopted Datacard's proposed findings of fact and conclusions of law. Specifically, the court found: Datacard's claims had not been discharged; Datacard was entitled to its response costs, attorney fees, and interest under CERCLA; Datacard was entitled to contribution from AMI for any future judgments entered against Datacard for response costs; and Datacard was entitled to both an injunction requiring AMI to perform any future cleanup and an award of attorney fees on its RCRA and CERCLA citizen suit claims.

■ We review the district court's findings of fact for clear error and its legal conclusions *de novo*. *Maher v. Harris Trust & Sav. Bank,* 75 F.3d 1182 (7th Cir.1996). However, we will apply the clearly erroneous standard with a little more bite where a district court has adopted a party's findings of fact verbatim. *Andre v. Bendix Corp.,* 774 F.2d 786, 800 (7th Cir.1985).

■ AMI first argues that the district court erred in allowing Datacard to directly pursue response costs under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). Only innocent parties, AMI says, can sue

under § 107(a)(4)(B). Datacard was limited, AMI asserts, to a claim for contribution under § 113(f). We disagree. In *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir.1994), we held that cost recovery disputes between two potentially responsible parties should ordinarily be addressed as claims for contribution under § 113(f). However, we noted if a landowner faces liability solely because a third party spilled or allowed hazardous waste to migrate onto its property, the landowner may directly sue for its response costs. *Id.* at 764. In this case, Datacard presumably paid less for DBS because it knew it was buying into an expensive clean-up. While that may have rendered Datacard a little less "innocent" than the landowner described in *Akzo*, Datacard did not take part in the manufacture of Blankrola. Instead, Datacard—like a party forced to clean up contamination on its property due to a third party's spill—faces liability merely due to its status as landowner. As a result, Datacard qualifies under *Akzo*'s exception and can directly pursue its response costs under § 107(a)(4)(B).

■ AMI next challenges the district court's finding that neither Datacard's CERCLA nor RCRA claims were discharged in bankruptcy. We have considered when a CERCLA claim arises for discharge purposes before. *See In re Chicago, Milwaukee, St. P. & Pac. R.R.*, 974 F.2d 775 (7th Cir. 1992) (*Chicago I*); *In re Chicago, Milwaukee, St. P. & Pac. R.R.*, 3 F.3d 200 (7th Cir.1993) (*Chicago II*). Although both *Chicago I & II* involved the discharge of CERCLA claims under the now-repealed Bankruptcy Act of 1898, our reasoning was not limited to Bankruptcy Act cases. *See Chicago I*, 974 F.2d at 781 (explaining that both the Act and code define dischargeable claims broadly). *See also Ninth Ave. Remedial Group v. Allis–Chalmers Corp.*, 195 B.R. 716 (N.D.Ind. 1996) (applying *Chicago I & II* to claim arising under the Bankruptcy Code); *In re Jensen*, 995 F.2d 925, 929 (9th Cir.1993) (adopting test from *Chicago I* in a code case). To determine whether Datacard's CERCLA claims were discharged, then, we need to start with a quick look at *Chicago I & II*.

In *Chicago I*, the Milwaukee Road petitioned for reorganization under the bankruptcy act in 1977. Two years later one of its trains crashed in Tacoma, Washington, spilling large amounts of copper ore and arsenic. In 1984 the Washington Department of Transportation (DOT) purchased the crash site from the bankruptcy trustee. In June 1985 the Washington Department of Energy checked the soil at the site and sent the folks at Transportation a letter which said the site needed to be cleaned up. The DOT then took its own soil samples and in November received results confirming the contamination. Despite having direct knowledge of the contamination at least a month before the Milwaukee Road's December 26, 1985, bankruptcy court bar date, the DOT didn't file a claim until 1989. We affirmed the district court's decision to discharge the DOT's claim, reasoning, for discharge purposes, a CERCLA claim arises when the claimant can "tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs." 974 F.2d at 786.

In *Chicago II*, we again affirmed the discharge of CERCLA claims filed after the Milwaukee Road's bar date. 3 F.3d 200. In December 1980 the Union Pacific Railroad purchased a piece of property within the Milwaukee Road's Tacoma railyard from the trustee. The railyard was located within a well-publicized Superfund site, which had even earned the dubious distinction of being dubbed one of the "ten worst" sites on the EPA's national priorities list. Before the bankruptcy was confirmed, the EPA also launched a massive investigation of the site, and a state-commissioned study detailing the site's problems was published. Finally, before the sale, Union Pacific's own engineers inspected the railyard. The engineers noticed oil and grease on the ground and found soil near an old fueling area saturated with diesel fuel. The engineers passed word of their findings to company officials in a memo, which concluded that contamination at the railyard "covers a large area and may require extensive clean-up." *Id.* at 203. Despite this information, Union Pacific didn't file a claim before the bar date. We found

that sufficient information existed, had Union Pacific sought it out, to give Union Pacific at least constructive knowledge that it possessed a CERCLA claim during the bankruptcy. *Id.* at 207.

Turning to the case at hand, the gist of AMI's argument is that DBS's ignorance should not be Datacard's bliss. Datacard's CERCLA claims should be discharged, AMI says, because had DBS made any attempt to seek the information out, DBS would have known it needed to file a CERCLA claim before the 1982 bankruptcy was confirmed. AMI claims that DBS had constructive knowledge of environmental contamination not based on an indirect source, like a news report or a state study, but from a source closer to home: DBS's own employees. After all, many of DBS's employees had previously worked for AMI and not only knew of spills but had caused them. According to AMI, had DBS merely read through its employment files, for example, DBS would have discovered a warning notice relating to Mr. Proper's 1971 spill and would have realized that it needed to file a CERCLA claim before AMI's bankruptcy was confirmed.

AMI's attempt to equate the data available to DBS with the information available to Union Pacific in *Chicago II* doesn't fly. Unlike in *Chicago II*, there had been no visible signs of contamination, no soil testing, no EPA involvement, and no publicized spills at the Holmesville site. In fact, before Datacard came on the scene in 1986, not even *AMI* realized it faced CERCLA liability. AMI had never reported a release to the EPA, and AMI's own environmental compliance officer thought when mishaps occurred, the chemicals spilled onto concrete and quickly evaporated. At trial AMI even argued that the money Datacard spent syphoning Blankrola off of the groundwater shortly after buying the site was not recoverable because the money was not spent in response to a *known* or threatened release of hazardous substances. Finally, the warning notice in Mr. Proper's work file was not the red flag that AMI would have us believe. The notice merely mentions a large product loss and doesn't tip Datacard off that a spill—and not a mixing error—was to blame. As a result,

the district court's factual finding that DBS did not have sufficient information to tie AMI to environmental contamination before AMI's bankruptcy was confirmed was not clearly erroneous. It follows, then, that the district court's conclusion that Datacard's CERCLA claims had not been discharged was not an abuse of discretion.

We also affirm the district court's conclusion that Datacard's RCRA claims survived AMI's bankruptcy. The district court found that Datacard was entitled to an order directing AMI to clean up the site under RCRA § 7002, 42 U.S.C. § 6972. Whether a cleanup order can be discharged in bankruptcy depends on whether the order can be converted into a monetary obligation. Only orders which can be turned into a "right to payment" are considered dischargeable "claims" for bankruptcy purposes. 11 U.S.C. § 101(5)(A). *See also In re Torwico Elecs., Inc.,* 8 F.3d 146 (3d Cir.1993) (cleanup order entered after bar date was not dischargeable), *cert. denied,* 511 U.S. 1046, 114 S.Ct. 1576, 128 L.Ed.2d 219 (1994); *In re CMC Heartland Partners,* 966 F.2d 1143 (7th Cir. 1992) (order requiring landowner to clean up contamination ran with the land and was not dischargeable); *cf. Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985) (order converted into right to payment was discharged in bankruptcy). The question is, then, can Datacard convert the district court's order into a right to payment? The answer to that question is no. *See Meghrig v. KFC W., Inc.,* —— U.S. ——, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) (RCRA does not allow a party to clean up site and sue for response costs in lieu of seeking an injunction). As a result, we affirm the district court's decision that Datacard's RCRA claims were not discharged in bankruptcy.

AMI next argues that even if Datacard's claims were not discharged, the district court should not have left AMI on the hook for attorney fees connected with Datacard's CERCLA § 107(a)(4)(B) response cost action. In support of its award, the district court cited *Amcast Indus. Corp. v. Detrex Corp.,* 822 F.Supp. 545 (N.D.Ind.1992), *rev'd in part on other grounds,* 2 F.3d 746 (7th Cir.1993), *cert. denied,* 510 U.S. 1044, 114

S.Ct. 691, 126 L.Ed.2d 658 (1994), which had held that response costs included reasonable attorney fees. However, in *Key Tronic Corp. v. United States,* 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), a case actually cited by the district court (but in the wrong place), the Supreme Court held that attorney fees did not generally qualify as response costs under § 107. The Court, however, carved out a narrow exception for attorney fees not incurred in pursuing litigation. *Id.* at 820, 114 S.Ct. at 1966. The Court reasoned only attorney fees paid for services like identifying potentially responsible parties qualified as response costs because those types of tasks "might well be performed by engineers, chemists, [or] private investigators." *Id.*

The district court's award of attorney fees under § 107 cannot stand. Datacard's attorney fees—even its nonlitigation attorney fees—do not fall under *Key Tronic's* exception. The record shows that Datacard's nonlitigation attorney fees were racked up investigating Datacard's own legal responsibilities in dealing with the Ohio EPA, not in identifying other polluters. This was not work which could have been done by engineers or chemists; it was work done with an eye toward going after AMI.

■ AMI's next set of arguments take aim at Datacard's citizen suit claims under subsections (a)(1)(A) and (a)(1)(B) of RCRA § 7002, and § 310(a) of CERCLA, 42 U.S.C. § 9659(a). First, AMI targets the claims as a group, arguing Datacard is not a proper citizen suit plaintiff. AMI contends that Datacard, a potentially responsible party under CERCLA, was not acting in the public interest, but merely pinned a few citizen suit claims for injunctive relief to its cost recovery action as a veiled attempt to recover otherwise unavailable attorney fees. While we agree with AMI that the idea behind citizen suit enforcement is to unleash an army of private attorneys general to force cleanups when the government drags its feet, the plain language of RCRA and CERCLA does not exclude parties like Datacard from the class of potential citizen suit plaintiffs. Rather, both RCRA and CERCLA allow "any person" to bring citizen suits. RCRA § 7002(a), 42 U.S.C. § 6972(a) (conferring standing on "any person"); CERCLA § 310(a), 42 U.S.C. § 9659(a) (same). As a result, we find that Datacard is a proper citizen suit plaintiff.

Having failed to knock out all three citizen suit claims with one punch, AMI next takes a divide-and-conquer approach. Before we address AMI's individual challenges to each of the citizen suits, however, a word to Datacard's RCRA claims is in order. Datacard brought claims under both RCRA § 7002(a)(1)(A) and (a)(1)(B). Subsection (a)(1)(A) authorizes citizen suits against any party alleged to be in violation of any regulation which has become effective under RCRA. Unlike its subsection (a)(1)(A) counterpart, subsection (a)(1)(B) does not require a plaintiff to point to a violation of a specific regulation. Instead, subsection (a)(1)(B) authorizes citizen suits against any person who has contributed to the storage or disposal of solid or hazardous waste which may present an "imminent and substantial endangerment to health or the environment."

The ability to pursue a claim under either subsection is limited by the notice and delay requirements of § 7002(b). Before bringing a subsection (a)(1)(A) claim, a plaintiff must provide notice of the claim to the EPA, the state in which the facility is located, and the alleged violator. Then, the plaintiff must delay commencement of the suit for at least 60 days. 42 U.S.C. § 6972(b)(1)(A). Similarly, notice and a 90–day delay period is required before a citizen suit may be filed under subsection (a)(1)(B). 42 U.S.C. § 6972(b)(2)(A). The purpose of the delay is twofold. First, the period allows the EPA an opportunity to head citizen suits off at the pass and assume the lead role in compelling compliance with RCRA through administrative proceedings. *Hallstrom v. Tillamook County,* 493 U.S. 20, 29, 110 S.Ct. 304, 310, 107 L.Ed.2d 237 (1989). Second, the delay period gives the alleged violator an opportunity to clean up its act, voluntarily comply with RCRA, and avoid litigation. *Id.*

The delay periods do not apply to every citizen suit filed under RCRA. Instead, in the 1984 amendments to the Act, Congress carved out an exception to each of RCRA's

delay provisions. Congress reasoned when violations of hazardous waste regulations have been alleged, the threat of greater harm to health and the environment posed by a delay outweighs the benefits of allowing the EPA an opportunity to assume the lead role and the alleged violator a chance to avoid litigation. As a result, when a citizen, acting as a private attorney general, alleges a claim "respecting a violation of subchapter III" of RCRA—the section of the Act dealing with hazardous waste management—the suit may be commenced immediately after giving notice. 42 U.S.C. § 6972(b)(1)(A) & (b)(2)(A). *See also Hallstrom,* 493 U.S. at 26–27, 110 S.Ct. at 308–10 (noting that Congress "abrogate[d] the ... delay requirement when there is a danger that hazardous waste will be discharged").

■ With that background in mind, we turn to AMI's challenges to Datacard's RCRA citizen suit claims. AMI first alleges that Datacard is not entitled to relief on its citizen suit brought under subsection (a)(1)(A). Datacard's subsection (a)(1)(A) claim arises out of AMI's repeated spills of tetrachloroethylene, a chemical covered by RCRA's hazardous waste regulations. Specifically, Datacard alleged that AMI was in violation of 40 C.F.R. § 262.34, which prohibits generators from accumulating hazardous wastes for more than 90 days, as well as 40 C.F.R. parts 264, 265, and 270, which provide the operating rules and permit requirements for hazardous waste treatment, storage, and disposal facilities. AMI contends that because Ohio administers an EPA-approved hazardous waste program, Datacard was required to base its subsection (a)(1)(A) claim on a violation of an Ohio regulation.

■ AMI is correct. RCRA allows each state to promulgate its own hazardous waste program. 42 U.S.C. § 6926. If a state program receives EPA authorization, its standards supersede federal regulations. *Dague v. City of Burlington,* 935 F.2d 1343 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Ohio's program was formally approved in 1989. 40 C.F.R. 270.1800 (1996). As a result, the federal regulation cited by Datacard was ineffective in Ohio at the time

of the amended complaint and cannot be the basis for injunctive relief. *City of Heath v. Ashland Oil, Inc.,* 834 F.Supp. 971, 978–79 (S.D.Ohio 1993) (federal regulations do not support a subsection (a)(1)(A) claim in Ohio). It follows, then, that the judgment for Datacard on its subsection (a)(1)(A) claim cannot stand.

■ AMI next argues that Datacard was not entitled to an injunction based on its other RCRA citizen suit, the subsection (a)(1)(B) claim. AMI admits it is a proper target for an (a)(1)(B) claim but contends that Datacard failed to properly delay its suit for 90 days after giving notice. Datacard gave notice on January 23, 1987. AMI fired back with a suit for a declaratory judgment. On April 13, 1987, 10 days before RCRA's 90–day delay period expired, Datacard filed its subsection (a)(1)(B) citizen suit as a Rule 13 counterclaim to AMI's complaint.

The district court concluded that Datacard had complied with RCRA's delay provision in three ways: Datacard amended its complaint after the delay period had expired; AMI had waived the protection of the delay requirement by seeking a declaratory judgment; and Datacard's April 1986 letter to the Ohio EPA started the clock ticking on the delay period. Sensing problems with each of the district court's explanations, Datacard now argues that its subsection (a)(1)(B) claim falls within the exception to the 90–day delay period because the storage and disposal of hazardous waste is at issue. In response, AMI asserts that only claims alleging specific violations of RCRA's subchapter III hazardous waste regulations, and not those merely "involving" hazardous waste, qualify under the language of the exception.

[11, 12] We agree with AMI that Datacard's subsection (a)(1)(B) cause of action, standing alone, does not appear to constitute a claim respecting a violation of RCRA's hazardous waste management regulations. However, that determination does not end our inquiry. Rather, we note that Datacard's other RCRA claim, the subsection (a)(1)(A) suit, alleged a specific RCRA hazardous waste violation, and Datacard was entitled to bring that claim without delay.

Because Datacard's complaint contained both a citizen suit claim subject to RCRA's delay period and one immune from the delay requirement, we are dealing with what other courts have labeled a "hybrid" complaint. *See, e.g., Dague*, 935 F.2d at 1351; *Glazer v. American Ecology Envtl. Servs. Corp.*, 894 F.Supp. 1029, 1044 (E.D.Tex.1995); *Orange Env't, Inc. v. County of Orange*, 860 F.Supp. 1003, 1021 n. 17 (S.D.N.Y.1994). Although we have concluded that the district court erred in allowing Datacard to prevail on its subsection (a)(1)(A) claim, whether a party has complied with RCRA's notice and delay provisions is determined at the time the complaint is filed. *See Hallstrom*, 493 U.S. 20, 110 S.Ct. 304; *Dague*, 935 F.2d at 1353. As a result, the fact that Datacard was not ultimately entitled to relief on its citizen suit under subsection (a)(1)(A) has no bearing on whether Datacard's subsection (a)(1)(A) allegations are sufficient to keep Datacard's hybrid complaint in court. *Id.* at 1352–53; *Orange*, 860 F.Supp. at 1021 n. 17. The only question is, then, did Datacard's hybrid complaint pull its subsection (a)(1)(B) claim within the exception to RCRA's 90–day waiting period?

A number of courts have held that a hybrid complaint does bring all of a plaintiff's citizen suit claims within the exception. *See Dague*, 935 F.2d at 1352; *Glazer*, 894 F.Supp. at 1044; *Orange*, 860 F.Supp. at 1021 n. 17. For example, in *Dague*, the neighbors of a municipal landfill sued the city under both RCRA § 7002(a)(1)(A) and (a)(1)(B) only 1 day after giving notice. 935 F.2d at 1348–49. The subsection (a)(1)(A) claim alleged a violation of a federal hazardous waste management regulation and was immune from RCRA's delay requirements. The subsection (a)(1)(B) claim, on the other hand, alleged the city's disposal of solid as well as hazardous waste had created an imminent and substantial endangerment to the environment and was subject to RCRA's delay period. The Second Circuit held that the plaintiffs did not need to observe the delay period otherwise applicable to the subsection (a)(1)(B) claim. *Id.* at 1352. The court reasoned that if a hybrid complaint did not trigger the exception to the delay period, the plaintiffs would have been impermissibly

forced to either postpone the hazardous waste claim—a claim that Congress stated could be brought without delay—or file the hazardous waste claim immediately and seek permission to amend their complaint to include the other RCRA claim after the delay period expired. *Id.* at 1351–52.

We find the Second Circuit's reasoning in *Dague* persuasive and hold that Datacard was not required to wait 90 days before filing its hybrid complaint. In reaching that conclusion, we note that allowing Datacard's hybrid complaint to fall within the exception to RCRA's notice and delay provisions will not undermine either of Congress' reasons for requiring delay. First, it would make little sense to keep a window of opportunity open for the EPA to step in and take the lead role on one of Datacard's claims when Datacard has already been given authority to immediately sue AMI for violations of RCRA's hazardous waste management regulations. Second, the delay period is designed to allow a party like AMI a period in which to clean up its act and avoid litigation. AMI was clearly not interested in using the delay period to resolve the dispute without going to court. In fact, AMI is only able to argue that Datacard failed to observe RCRA's delay requirement because AMI responded to Datacard's notice with a suit for a declaratory judgment. Finally, it is important to note that although Datacard's subsection (a)(1)(A) hazardous waste claim ultimately proved unsuccessful, it was not frivolous. There was no question that AMI had released hazardous waste. Datacard simply based the claim on the wrong set of regulations—an error that not even AMI noticed until it filed its reply brief. If future plaintiffs should attempt an end run around RCRA's delay requirements by alleging a meritless hazardous waste claim in a hybrid complaint, the district court could sanction the plaintiffs under Rule 11 and dismiss the case to ensure full compliance with the delay period. Because Datacard's hazardous waste claim was not frivolous, however, we find that RCRA's delay provision did not apply to Datacard's hybrid complaint. It follows, then, the district court

properly granted Datacard injunctive relief on its subsection (a)(1)(B) claim.[1]

▮▮▮ Although we have concluded that the district court properly granted Datacard injunctive relief on one of its RCRA citizen suit claims, the issue of attorney fees remains. Because RCRA allows a district court to award a prevailing citizen suit plaintiff attorney fees "whenever the court determines such an award is appropriate," we review an award of attorney fees for an abuse of discretion. In this case, the district court simply stated, in one sentence, that Datacard was entitled to attorney fees under RCRA § 7002(e), 42 U.S.C. § 6972(e). Because the district court did not note any justification for the award, we are unable to determine whether the district court appropriately exercised its discretion. As a result, we remand this portion of the case to the district court for further explanation.

▮▮▮ AMI next contends that the district court erred by denying its request to reopen discovery. Because the regulation of discovery matters is best left to the trial judge, especially a seasoned and able judge like Judge Norgle here, we tread cautiously when reviewing claims like this. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir.1996). Because *Chicago I* was not decided until after discovery closed in this case, AMI claims that the adoption of that test triggered the need for more discovery. Judge Norgle reasoned that AMI was merely attempting to fine-tune its discovery—which had lasted over 4 years—and denied the request. Because we agree that AMI's discovery had always focused on the timing of the spills, the extent of the contamination, what each party knew, and when they knew it, we can't say the judge abused his discretion in denying AMI's request.

▮▮▮ AMI's final point on appeal is that the district court should have considered disallowing Datacard's claims under § 502(e)(1)(B) of the Bankruptcy Code. AMI first raised this argument in its post-trial brief. The district court struck the

argument, reasoning that the Delaware bankruptcy court retained exclusive jurisdiction over the allowance of claims, and that even if the court had jurisdiction, AMI waived the affirmative defense by failing to raise it earlier.

We find that the district court lacked jurisdiction to hear this claim. Because Datacard did not have "sufficient information" to give rise to a claim in the 1982 Illinois bankruptcy, AMI's disallowance defense applies only to the 1993 Delaware bankruptcy. The Delaware bankruptcy court's order lifting the stay in that case gave AMI and Datacard the green light to litigate their Illinois claims. The order also provided that neither party could execute any judgment obtained in the Illinois case without an order from the Delaware bankruptcy court. Additionally, in both its order confirming AMI's reorganization plan and the plan itself, the Delaware bankruptcy court stated that it retained "exclusive jurisdiction" to "determine any and all objections to the allowance of Claims." The plain language of the order and the plan couldn't be clearer. The bankruptcy court authorized the Illinois district court to settle liability issues but remained the sole authority on bankruptcy issues such as the allowance of claims. As a result, when Datacard returns to Delaware to execute the judgment in this case, AMI can raise its disallowance defense in that forum.

Our opinion today means that the bulk of the district court's judgment is AFFIRMED. A small portion of the judgment is REVERSED, and an even smaller portion is REMANDED to the district court for further explanation. To summarize, everything in the judgment except the award of attorney fees—under CERCLA and on the RCRA § 7002(a)(1)(B) claims—and the liability finding and injunction under RCRA § 7002(a)(1)(A) is AFFIRMED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

Costs are awarded to the defendants-appellees.

---

1. Because we find that Datacard was entitled to the injunctive relief ordered by the district court based on its RCRA § 7002(a)(1)(B) claim, we need not address the additional basis for the injunction, Datacard's citizen suit brought under CERCLA § 310(a).

RIPPLE, Circuit Judge, concurring.

I concur fully in the judgment of the court and am pleased to join the court's comprehensive and thoughtful opinion. I write separately only to emphasize that we do not decide whether the 90-day waiting provision contained in 42 U.S.C. § 6972(b)(2)(A) applies to compulsory counterclaims brought under Rule 13(a) of the Federal Rules of Civil Procedure. Although we have assumed arguendo that the waiting period applies to such claims, our holding ought not be understood as deciding the issue sub silentio.

This case demonstrates the difficulty in applying the 90-day waiting requirement to the filing of compulsory counterclaims. In this case, Datacard properly gave notice of its intent to sue for response costs and an injunction. AMI, in response, immediately commenced a declaratory judgment action. At that point, Datacard filed its answer, as required by the Federal Rules of Civil Procedure, before the 90-day waiting period had expired. Datacard had to assert the RCRA claims in that answer. *See* Fed.R.Civ.P. 13(a). One is tempted to say that AMI "waived" its right to insist on the 90-day waiting period by filing the declaratory judgment action. The "waiver" theory, however, cannot carry the day because of *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). RCRA's notice provisions are "jurisdictional" in nature. *Id.* at 31, 110 S.Ct. at 311–12.

Although *Hallstrom* forecloses waiver, that decision does not foreclose an interpretation of § 6972(b)(2)(A) that excludes compulsory counterclaims from the 90-day waiting requirement. In holding that RCRA's delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision, the Supreme Court noted:

> [P]etitioners have full control over the timing of their suit: they need only give notice to the appropriate parties and refrain

from commencing their action for at least 60 days. The equities do not weigh in favor of modifying statutory requirements when the procedural default is caused by petitioners' "failure to take the minimal steps necessary" to preserve their claims.

493 U.S. at 27, 110 S.Ct. at 309 (citation omitted). Unlike the petitioners in *Hallstrom*, Datacard did not "have full control over the timing of [its] suit"; it did not have the luxury to refrain from filing suit within 90 days of notice. Instead, the timing of Datacard's suit was largely at the mercy of AMI and the Federal Rules of Civil Procedure. Datacard took the " 'minimal steps necessary' to preserve [its] claim" by initially giving notice. It was the initiation of adversarial proceedings by AMI that compelled Datacard to initiate a RCRA citizen suit before the 90–day period had expired.

In addition, the plain language of § 6972(b)(2)(A) can be read to exclude compulsory counterclaims. Section 6972(b)(2)(A) of Title 42 provides that "[n]o action may be *commenced* under subsection (a)(1)(B) of this section prior to ninety days after the *plaintiff* has given notice of the endangerment." 42 U.S.C. § 6972(b)(2)(A) (emphasis added).[1] Rule 3 of the Federal Rules of Civil Procedure provides that a plaintiff "commences" an action by "filing a complaint with the court." Fed.R.Civ.P. 3. A plausible reading of § 6972(b)(2)(A) is that Datacard was not required to comply with the 90–day waiting period because it did not "commence" a RCRA action as a plaintiff within the meaning of § 6972(b).[2] This interpretation not only finds support in the statute's plain language and in *Hallstrom*, but it also seemingly harmonizes the jurisdictional nature of the statute with the policies underlying the law of waiver.

Nevertheless, I believe that the court has taken the more prudent course in not basing its decision on this interpretation of

---

**1.** In like terms, § 6972(b)(1)(A) contains a 60–day waiting period, which applies to actions commenced under subsection (a)(1)(A). 42 U.S.C. § 6972(b)(1)(A).

**2.** Of course, placing undue emphasis on the meaning of the term "commence" would prove

too much; that term is used in § 6972(a) as well as in § 6972(b). One difference is that § 6972(a) provides that "any person" may commence a citizen suit, whereas § 6972(b), which sets forth the notice and delay requirements, refers to "the plaintiff."

§ 6972(b)(2)(A). The issue has not been briefed by the parties. Additionally, one court has held that the section does apply to compulsory counterclaims. *See Portsmouth Redevelopment & Housing Auth. v. BMI Apartments Assocs.,* 847 F.Supp. 380, 386 (E.D.Va.1994). That court recognized the importance of notifying the EPA, the State and the other persons covered by § 6972(b)(2)(A)(iii) of environmental contamination. The *Portsmouth Redevelopment* court reasoned that a party in Datacard's predicament is "obligated to inform the court of its intentions [to file a counterclaim] so that appropriate case-management provisions, including a provision for the delayed filing of counter-claims . . ., if necessary, c[an be] inserted in the pretrial order." 847 F.Supp. at 386.

Given the arguments that have been made before us, the court's ground for decision is adequate and compatible with, although not compelled by, the Second Circuit's decision in *Dague v. City of Burlington,* 935 F.2d 1343 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). The practical quandary of counter-claimants will need further judicial or legislative elaboration in the future.