**TAYLOR FARM LIMITED
LIABILITY COMPANY,**
Plaintiff,

v.

**VIACOM INC., Defendant.**

No. IP01–1734 C–M/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 24, 2002.

Thomas Barnard, Sommer & Barnard, Indianapolis, IN, for Plaintiff.

Kenneth K. Kilbert, Babst Calland Clements and Zomnir, Pittsburgh, PA, Brent D. Taylor, Baker & Daniels, Indianapolis, IN, for Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, Chief Judge.

This matter comes before the Court on a motion for summary judgment by the Defendant, Viacom Inc. ("Viacom"). Viacom asks this Court to find that the complaint filed by the Plaintiff, Taylor Farm, L.L.C. ("Taylor"), under the Indiana Environmental Legal Action statute ("IELA") is barred by the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").

The gist of Viacom's argument is that: because it entered into a court-approved comprehensive settlement agreement (the "Settlement Agreement," also referred to by the parties as the "Consent Decree") with the Environmental Protection Agency ("EPA"), requiring it to clean up the hazardous waste site known as Neal's Landfill, it cannot be subject to further lawsuits in state or federal court, seeking to force it to perform or pay for further cleanup activities. Viacom invokes two clauses of CERCLA, arguing alternatively that section 113(f)(2) of CERCLA (hereinafter, the "contribution bar") prevents Taylor from making a "contribution" claim against Viacom, or that section 113(h) of CERCLA (hereinafter, the "jurisdiction bar") pre-

vents this Court from exercising jurisdiction over Taylor's claim.

Taylor, on the other hand, argues that, because it did not contribute in any way to the original contamination of Neal's Landfill, it is not suing Viacom for contribution, but rather for damages to its land. Taylor further points out that it is not seeking additional cleanup at the specific site, Neal's Landfill, which was the subject of the Settlement Agreement. Rather, it is seeking the cleanup of property located downstream from Neal's Landfill, subsequently contaminated by the PCBs that Viacom disposed of in Neal's Landfill.

For the reasons discussed below, the Court finds that there is a question of fact as to whether Taylor is an "innocent landowner." If innocent, Taylor's claim cannot be characterized as a contribution claim and therefore the claim is not subject to the contribution bar. The Court further finds, as a matter of law, that the jurisdiction bar only applies to federal claims or state law claims that really constitute a backdoor attack on a CERCLA settlement agreement. There is no evidence that Taylor's lawsuit was intended to prevent or delay the implementation of Viacom's Settlement Agreement, nor that it would be likely to have that effect. And, to the extent that Taylor's claim is like a federal claim, it most closely resembles a so-called "cost recovery" claim under section 107(a) of CERCLA. Such claims are explicitly exempted from CERCLA's jurisdiction bar. Therefore, the Court **DENIES** the Defendant's motion for summary judgment.

## I. FACTS AND PROCEDURAL POSTURE

The facts in the light most favorable to Taylor are these:

Taylor, whose sole proprietor is Craig Taylor ("C. Taylor"), owns 179 acres of land (the "Taylor Farm") in Monroe County, Indiana, just a few miles west of Bloomington. Affidavit of Craig Taylor ("C. Taylor Aff.") ¶ 2; Complaint, ¶¶ 1, 7. About 40 acres originally belonged to C. Taylor's grandfather, Chester Taylor, who used that parcel to grow hay and raise cattle. Deposition of C. Taylor ("C. Taylor Dep."), tab 4 at 42–3.

The remaining 139 acres, hereinafter the "Neal Parcel", was acquired from Richard Neal ("Neal") in 1977 [1] by C. Taylor's parents, William Taylor ("Wm. Taylor") and Wanda Taylor ("W. Taylor"), together with two other investors.[2] Complaint, ¶ 9; Tab F, Ex. 6; Viacom's Reply to Plaintiff's Response to Defendant's Statement of Material Facts (hereinafter "Facts"), ¶ 2. At the time of the purchase, both Wm. Taylor and W. Taylor knew that Neal had been using an 18–acre portion of his property as a solid waste landfill ("Neal's Landfill."). Complaint, ¶ 10. However, there is no evidence that they knew about any hazardous wastes having been deposited in the landfill.

In the late 1960's Viacom, through its predecessor company, Westinghouse Electric Corporation (hereinafter, collectively referred to as "Viacom"), operated a facility in Bloomington which manufactured electrical capacitors. Deposition of Stephen Wardzinski ("Wardzinski Dep."), Tab

1. Technically, the land was purchased by means of an installment land sale contract dated December 17, 1977. Ownership of the land was transferred by warranty deed in 1980.

2. The Neal Parcel was deeded in 1980, pursuant to a land sale contract that the Taylors and the other two investors signed with Neal on December 17, 1977. *See* Plaintiff's Response and Defendant's Reply to Viacom's Statement of Material Facts, ¶ 2.

8 at 11, 14, 16–7. The plant generated a substantial amount of Polychlorinated Biphenyl ("PCB") contaminated waste (of a type known as "inerteen"). *Id.* at 11; Tab 9 at 2. For a period from approximately 1966–1968, Viacom contracted with Neal to dispose of such waste—including sawdust, rags, a clay material called fuller's earth, and a large number of rejected capacitors and capacitor parts—in Neal's landfill. *Id.* In a letter dated October 1, 1968, Viacom instructed Neal that "[i]t is permissible to dump inerteen ... out of containers in the approved location so long as the liquid dumped soaks completely into the ground leaving no pools." Tab 10. Viacom further instructed: "When the ground is saturated, the location must be backfilled to a minimum depth of one foot." *Id.* Viacom did not instruct Neal to make any further effort to contain the PCB's at the site. *Id.*

The groundwater that flows beneath Neal's Landfill ultimately resurfaces at a location known as "Northwest Springs," which consists of two primary springs known as "North Spring" and "South Spring." Complaint ¶ 22. Taylor contends that PCBs have migrated to the Northwest Springs, and thence downstream to Conard's Branch and ultimately to Richland Creek. Complaint, ¶¶ 22–4. The Northwest Springs and the uppermost portion of Conard's Branch are located on Taylor Farm. Viacom's Statement of Material Facts ("D. Facts") ¶ 13.

In 1981, the United States EPA wrote to Wm. Taylor, as owner of the Neal's Landfill, informing him that "there is a substantial threat of discharge of Polychlorinated Biphenyls (PCB's), a hazardous substance, from Neal's Landfill into tributaries of Richland Creek." The EPA further stated that its policy is "to request the owner or operator ... or party responsible ... to accept responsibility to abate the threat." Tab F, C. Taylor Dep., Ex. 16. The EPA then noted that it has the authority, "pursuant to 33 U.S.C. 1321(c)(1)" to initiate action to hold "[t]he owner or operator or party responsible ... liable for the costs of the remedial actions" necessary. *Id.*

In 1982, the EPA wrote to Wm. Taylor that it "has determined that there have been and continue to be actual releases of a hazardous substance, i.e. [PCB's] at the Neal's landfill site, which you own," and that it "may also undertake such remedial measures as are indicated." Tab F, C. Taylor Dep., Ex. 18. The EPA further noted that "under the law, federal costs incurred in this manner may be recovered in a civil suit from ... the owner of the site from which a hazardous substance is released." *Id.*

In early 1983, the United States and the State of Indiana sued Viacom under the CERCLA, seeking to force Viacom to clean up the PCB wastes it deposited at Neal's Landfill. D Facts, ¶ 17. Not long thereafter, the EPA declared Neal's Landfill a federal Superfund site. 48 Fed.Reg. 40670, 40672 (Sept. 8, 1983).

During the same year, Wm. Taylor acquired the interests of his wife and the other two investors, becoming the sole owner of Taylor Farm. D. Facts, ¶ 5. Following his death in 1997, the property then passed to his widow, W. Taylor. D. Facts, ¶ 6. Taylor LLC acquired ownership in 1998. *Id.*

In 1985, Viacom entered into a Settlement Agreement with the EPA, addressing PCB contamination at Neal's Landfill and five other related sites. Viacom Ex. B. The Agreement required Viacom to take the following remedial response actions affecting Taylor Farm:

1) Excavate and incinerate waste from a defined area of Neal's Landfill. Viacom Ex. B, ¶¶ 42–6.

2) Remove and incinerate PCB-contaminated soils and sediments from Conard's Branch and a portion of Richland Creek. *Id.*, ¶ 51.

3) Construct and operate a facility to treat groundwater flowing from the North and South Springs to reduce PCB levels before the water enters Conard's Branch. *Id.*, ¶ 59(a).

The Settlement. Agreement further required Viacom to submit plans to "close" the landfill site following the excavation. *Id.*, ¶ 52. After closure, Viacom was to sample sediments from various locations on Richland Creek and Conard's Branch, to determine whether the sediments in any given area contained excessive amounts of PCBs. *Id.*, ¶¶ 51(g)(1), 51(c), 51(g)(3).[3] If so, the Agreement further required Viacom to remove the contaminated sediment, *Id.*, ¶ 51(g)(1), and incinerate it. *Id.*, ¶ 51(h). The amounts to be incinerated were not to exceed 1,100 cubic yards from Richland Creek and 900 cubic yards from Conard's Branch. *Id.*, ¶ 51(g)(3).

The Consent Decree also included a Covenant Not to Sue. *Id.*, ¶ 111. "[C]onditioned only upon compliance by [Viacom] with the provisions of this Decree and subject to the reservation of rights set forth in [§ 111(e)]," the United States, City, and County "[undertake] not to assert against [Viacom] ... any claim arising under federal, state or local law, including common law, intended to protect the environment ... [which] result[s] from or relat[es] to: (1)[t]he past disposal or discharge of PCBs or materials contaminated with PCBs at [Neal's Landfill] ...; (2)[t]he release or threatened release of PCBs or materials contaminated with PCBs from [Neal's Landfill] ...; [and] (5)[a]ctivities which [Viacom] performs in compliance with this Consent Decree ..., excluding the performance of activities in a manner which violates standards of care required by applicable federal, state, or local law." *Id.* ¶ 111(a).

The Covenant further specified: "Nothing in this Section shall be construed to relieve [Viacom] from any liability at law or equity for ... any acts, omissions or events not expressly referred to in this Covenant." *Id.* ¶ 111(b). Although the signatories agreed "based on currently available information that the remedies provided under this Consent Decree are adequate to abate the release or threat of release of hazardous ... substances from [Neal's Landfill]," they also recognized that unforeseen circumstances may lead to an environmental threat in the future. In such an event, "nothing ... in this Consent Decree is intended to affect the statutory rights of the United States to seek appropriate relief to abate a release or threat of release of hazardous wastes or substances, or to seek cost recovery ... where such release or threat of release may present an imminent and substantial endangerment to health, welfare, or the environment and results from previously unknown or unforeseen conditions that arise or are discovered after entry of the Consent Decree."

Viacom performed some of the response actions required by the Settlement Agreement. In 1988, Viacom removed sediment from the entire length of Conard's Branch and a small part[4] of Richland Creek. Via-

---

**3.** Paragraph 51(g)(1) refers to paragraph 51(c) for a complete list of streams to be sampled among the six sites covered by the Consent Decree. Paragraph 51(c) lists Richland Creek, but does not list Conard's Branch. However, paragraph 51(g)(3) explicitly names Conard's Branch as one of the streams from which sediments may have to be removed.

**4.** Viacom objects to the characterization as "small" and prefers to state more precisely

com Ex. D, p. 5. In 1990, Viacom finished construction and began operating a spring water treatment plant. *Id.* The plant was designed to treat up to one cubic foot per second of water and reduce the PCB content of that water to one part per billion ("ppb"). *Id.*

However, after entry of the Consent Decree, public opposition to the incinerator arose. Viacom Ex. C, p. 3. Viacom applied for a permit to build an incinerator, but the Indiana legislature passed a series of laws designed to prevent Viacom from incinerating PCB-contaminated materials. Viacom Ex. C, p. 3; I.C. §§ 13–22–3–8, 13–22–3–9, 13–7–10 *et. seq.*

As a result, approximately 320,000 cubic yards of PCB-contaminated waste[5] that were to have been excavated from Neal's Landfill and incinerated have instead remained on-site at Neal's Landfill. Complaint, ¶¶ 31–2; Viacom Ex. B, ¶ 46(d). In 1994, the original signatories to the Consent Decree decided to explore alternatives to incineration. Complaint, ¶ 34. In 1997, this Court appointed Magistrate Judge Kennard P. Foster as Special Master to oversee the process, which eventually resulted in an alternative source-control agreement for Neal's Landfilll. Viacom Ex. C, p. 3, and Ex. E. That agreement, and the Report and Recommendations of the Special Master were approved by this Court in February of 1999 and memorialized in a Record of Decision Amendment ("RODA"). Viacom Exs. C, E.

The modified source-control remedy ("Modified Agreement") for Neal's Landfill required Viacom to:

(1) Excavate and remove contamination in areas of the landfill considered to be "hot spots" (*i.e.* contaminated with greater than 500 ppm PCBs), and dispose of these wastes, believed to amount to about 7000 cubic yards, in an approved off-site chemical waste landfill. Viacom Ex. C at VT 005515.

(2) Excavate and remove all visible PCB contamination, such as capacitors and capacitor parts, and dispose of them off-site in an approved incinerator. *Id.* at VT 005516.

(3) Consolidate the remaining less heavily contaminated material into the more environmentally stable central 10–acres of the 18–acre landfill, thereby reducing the possibility of back-flooding of PCB contaminated soil. *Id.*

(4) Construct a landfill cap, compliant with regulations, to "close" the remaining 10–acre landfill. *Id.*

(5) Ensure that areas of the old landfill outside of the capped 10–acres have an average of less than 25 ppm PCBs with a maximum of 50 ppm, and cover those areas with six inches of clean soil. *Id.*

(6) Remediate areas located in drainage waterways outside the landfill cap to ensure a level of 1 ppm PCB's. *Id.*

(7) Develop a long-term inspection and maintenance plan for the landfill cap, and a groundwater and surface water monitoring program that is satisfactory to the governmental parties. *Id.*

This proposal was found to be effective in addressing the nine evaluation criteria used by the EPA, as set forth in the National Contingency Plan, 40 CFR Part 300.430. *Id.* at VT 005530. Most importantly, the Modified Agreement was found to be "protective of human health and the

---

that 300 linear feet of Richland Creek were excavated. *See* Facts, ¶

**5.** This number refers to the waste already in Neal's Landfill and does not count the

smaller, but unspecified, amount of contaminated soils and sediments excavated from Conard's Branch and Richland Creek. Viacom Ex. B, ¶ 51.

environment," and compliant with all Federal and State "applicable or relevant and appropriate requirements" directly associated with this action. *Id.* at VT 005516. The Agreement was also found to be cost-effective, with an estimated cost of $16.13 million. *Id.* at VT 005530.

In approving the Modified Agreement, this Court, per Judge S. Hugh Dillin ("Dillin"), directed Viacom to complete excavation and consolidation at Neal's Landfill in 1999, and to construct a cap and close the landfill in 2000. Viacom, Ex. E, VT 004981. Judge Dillin then ordered the parties to spend the next year conducting "water conduit and other relevant investigations . . . as necessary or useful to determine the [further] need for interim and permanent water treatment . . . and sediment removal." *Id.* At the end of that year, Judge Dillin directed that the parties "shall engage in further settlement negotiations regarding water treatment and sediment removal aspects of remediation." *Id.* Judge Dillin vested authority in the Special Master "to continue to oversee the implementation of the consent decree and the resolution of disputes among the parties until the work is completed, [and] the Consent Decree, as amended, is fully implemented." *Id.* at VT 004982.

In December of 2000, Viacom issued a report entitled FINAL REPORT: REMEDIATION OF NEAL'S LANDFILL. Viacom Ex. D. Dorothy M. Alke ("Alke"), the director of the clean-up project for Viacom, certified that "the information contained in or accompanying this submission is true, accurate and complete." *Id.* at VT 006740 a. The report stated that Viacom had completed the excavation of hot spots, the consolidation of the remaining contaminated materials, and the capping and closing of the landfill as of October, 1999. *Id.*

That did not entirely end Viacom's obligations under Judge Dillin's Order and the Modified Agreement. Viacom was still required to monitor the spring treatment plant for up to five years after the closing of the landfill. Viacom Ex. B, ¶ 59(a)(I)(h). And, per Judge Dillon's Order, Viacom was still obligated to conduct investigations for a year after the closure, to determine if there were any problems that might require further water treatment and sediment removal, and then to undertake negotiations with the governmental parties to the Consent Decree to address such problems, if any.

The parties have not provided this Court with information about the results of Viacom's investigations or about the nature of subsequent negotiations which have dragged on for about three-and-a-half years. But, to the extent that further sediment removal may be necessary, Viacom's degree of liability for the costs of such removal under its existing agreements is unclear. Judge Dillin's Order merely requires Viacom to negotiate about such issues.

In a January 29, 1999, letter to Thomas Alcamo of the EPA,[6] Alke expressed Viacom's opinion that it is not *required* to perform any other sediment removal because: (a) it "already complied with the [original] Consent Decree requirements for . . . remov[ing] sediments from Conard's Branch and Richland Creek" in 1988; and (b) the Modified Agreement "only covers source control measures and not . . . sediment removal." Taylor, Tab 9, at VT004984. Thus, according to Alke,

---

6. This letter was written immediately before the modified agreement was adopted, and therefore addresses it as the Proposed Plan for the Source Control Record of Decision Amendment at Neal's Landfill. Nevertheless, it expresses Viacom's view about the proper interpretation of the modified agreement as implemented.

Viacom "is prepared to discuss the performance of additional [sediment removal]" with the EPA and other governmental parties, but any agreement by Viacom to do so would "go beyond its obligations under the [original] Consent Decree, [the Modified Agreement], and applicable law." *Id.*

As of June, 2002, settlement negotiations with respect to water treatment and sediment removal due to the contamination of Neal's Landfill were ongoing. Alke Aff. ¶¶ 9–10. Pursuant to these negotiations, Viacom continues to conduct "investigatory work, under the supervision of the [EPA] with respect to groundwater and surface water in the vicinity of Neal's Landfill—including the North and South Springs . . ., Conard's Branch and Richland Creek—[in order to] evaluate whether further remedial action with respect to water treatment is necessary." *Id.*

In 2000, Taylor filed a Complaint in Monroe Circuit Court against Viacom asserting various common law theories and an IELA claim relating to the alleged releases of PCBs from Neal's Landfill. Facts, ¶ 39. Viacom had the case removed to this Court. Facts, ¶ 40. Taylor then moved to remand. *Id.* This Court, per Judge Richard L. Young ("Young"), found that, given the incomplete state of the remedial activities then being undertaken by Viacom, Count IV of Taylor's Complaint, the IELA claim, should be dismissed without prejudice. Viacom Ex. I (Jan. 11, 2001, Order on Plaintiffs' Motion to Remand), pp. 6–9. The Court then remanded the remaining Counts for consideration in state court. *Id.* at 1.

After Viacom made more progress toward completing its obligations with respect to the Settlement Agreement, and the Seventh Circuit, in *Frey v. EPA,* 270 F.3d 1129 (7th Cir.2001), issued a new opinion regarding the completeness issue,

Taylor re-filed its IELA Complaint in November of 2001.

Taylor is an Indiana limited liability company with its principal office in Bloomington, Indiana. Complaint, ¶ 2. Viacom is a Delaware corporation with its principal place of business in New York City. Complaint, ¶ 3. The potential cost of PCB cleanup at Taylor Farm exceeds $75,000. Complaint, ¶ 5.

## II. STANDARDS—SUMMARY JUDGMENT

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is genuine only if the evidence is such that a jury reasonably could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.* "In deciding a motion for summary judgment, the court will conclude that there is no genuine issue as to any proposed finding of fact to which no response is set out." *Hartley v. Wisconsin Bell, Incorporated,* 124 F.3d 887, 890 (7th Cir. 1997); Fed.R.Civ.P. 56(e).

The moving party has the initial burden to show the absence of genuine issues of material fact. *Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a

disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries*, 121 F.3d 281, 286 (7th Cir.1997); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, the Court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The Court must review all the evidence in the record, without making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). If a reasonable fact-finder could find for the opposing party, then summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). Conversely, if the standard embraced in Rule 56(c) is met and the Court determines that a reasonable jury could not find for the party opposing the motion, then summary judgment is manda-

tory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters.*, 975 F.2d at 1294.

## III. DISCUSSION

### A. VIACOM'S ARGUMENT

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.

Viacom makes two independent arguments for summary judgment. The first is that Taylor's complaint should be barred by section 113(f)(2) of CERCLA (the "contribution bar"). 42 U.S.C, § 9613(f)(2). The contribution bar enables a party "who has resolved its liability to the United States ... in a[ ] judicially approved settlement" (hereinafter a "settling party" or "SP") to avoid further liability to a non-settling party "for contribution regarding matters addressed in the settlement." *Id.*

Viacom's second argument is that Taylor's complaint should be barred by section 113(h) of CERCLA (the "jurisdiction bar"). Under the heading "Timing of Review," section 113(h) provides in relevant part:

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 [diversity jurisdiction] or under State law which is applicable under section 9621 of this title [relating to CERCLA clean-up standards] to review any challenges to removal or remedial actions selected under section 9604[or] 9606(a) of this title, in any action except one of the following:

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

## B. CHARACTERIZING TAYLOR'S COMPLAINT

An obvious problem with both of Viacom's arguments is that, on their face, the contribution bar and the jurisdiction bar apply only to actions brought under CERCLA. But Taylor has filed its claim under the Indiana Environmental Legal Action ("IELA"). Ind.Code § 13–30–9–1 et. seq. Section 13–30–9–2 of the IELA provides:

> A person may bring an environmental legal action against a person who caused or contributed to the release of a hazardous substance ... into the ... soil or groundwater ... to recover reasonable costs of a removal or remedial action involving the hazardous substance.

Taylor claims that Viacom, through its predecessor Westinghouse, caused the release of PCB's into the soil and groundwater of Taylor Farm, not just at Neal's Landfill, but also (through migration) into the property downstream from the landfill (hereinafter the "Downstream Property"). Complaint, ¶¶ 57–8. Taylor seeks reimbursement for any costs that it will have to incur in removing the PCB's or taking other remedial action as necessary to decontaminate the Downstream Property. Complaint, ¶ 59 and prayer for relief. Taylor's complaint is well-pleaded and clearly falls within the scope of the IELA.

Nevertheless, Viacom contends that Taylor's IELA claim is equivalent to a CERCLA claim and that, being equivalent to a CERCLA claim, it should be subject to the contribution bar and jurisdiction bar, even though it was brought under state law. But that raises the preliminary question: To what type of CERCLA claim is Taylor's IELA claim equivalent?

There are three distinct causes of action under CERCLA that have been discussed by the parties in their briefs. The first is a cause of action for *cost recovery*, which can be initiated by a private party or a governmental entity that incurs costs in cleaning up a contaminated site. CERCLA § 107(a), 42 U.S.C, § 9607(a). The second is a cause of action for *contribution*, which can be initiated by a defendant in a CERCLA lawsuit or by a person already found to be at least partially responsible for contaminating the site. CERCLA § 113(f)(1), 42 U.S.C, § 9613(f)(1). The third is a *citizen suit*, which can be initiated by "any person ... on his own behalf" seeking a court order "against any person ... alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter." 42 U.S.C. § 9659.

The parties primarily debate whether Taylor's complaint should be characterized as being more like a claim for cost recovery or more like a claim for contribution. This, in turn, depends upon whether Taylor should be considered an innocent party or a responsible party under CERCLA.

Section 107(a) (cost recovery) describes the types of persons who are potentially liable under CERCLA for cleaning up a hazardous waste site. To paraphrase, potentially liable persons include:

(1) the current owner or operator of the site;

(2) the owner or operator of the site at the time hazardous wastes were deposited there; and

(3) any person who disposed of, treated, or arranged for the disposal of hazardous wastes at the site.

Such persons have been widely described in CERCLA cases as "potentially responsible parties" or "PRP's." *See, e.g., Akzo Coatings, Inc., v. Aigner Corp.,* 30 F.3d 761 (7th Cir.1994). However, despite the intuitive content of this phrase, different courts have interpreted it differently. For example, in a footnote to *Pneumo Abex Corp. v. High Point, Thomasville and Denton R. Co.* the Fourth Circuit noted that: "[w]hile CERCLA does not define 'potentially responsible party,' the courts have understood it to refer to a party" who is: (1) potentially subject to liability under section 107(a); and (2) a defendant in a CERCLA lawsuit.[7] 142 F.3d 769, 773 (4th Cir.1998). On the other hand, in a footnote to *New Castle County v. Halliburton NUS Corp.,* the Third Circuit defined a PRP as someone who is: (1) potentially subject to liability under section 107(a); and (2) not entitled to the statutory defenses under section 107(b). 111 F.3d 1116, 1120 (3d Cir.1997).

This Court knows of no other case in which a court has provided an explicit definition of "PRP." However, the Court believes that, as a matter of common usage, a *potentially* responsible party should include any person who *might* be subject to liability under section 107(a). The Court further believes that this definition

of "PRP" is consistent with the usage of "PRP" within the Seventh Circuit. *See, e.g., Rumpke of Indiana, Inc., v. Cummins Engine Company, Inc.,* 107 F.3d 1235, 1236 (7th Cir.1997) (opening its discussion with: "The net of potential liability under [CERCLA] is wide indeed, reflecting the need both to clean up the nation's toxic waste sites and the practical imperative to find the necessary money for the job. The cleanup will be less likely to occur if potentially responsible parties do not come forward.") Therefore, this Court will carefully distinguish the broad category of potential defendants, or PRP's, from the narrower class of "responsible parties," meaning those persons who are: (1) potentially responsible under CERCLA, and (2) have no legally viable defense against liability.

Section 107(a) also defines the scope of a party's potential liability. PRP's can be sued for:

(A) all costs of removal or remedial action incurred by the United States Government or a State . . . not inconsistent with the national contingency plan;[8]

(B) any other necessary costs of response[9] incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources.

In particular, section 107(a)(B) authorizes an innocent private party who has incurred "response" costs to sue a PRP in an effort to recover those costs. *See Rumpke* 107 F.3d at 1241–2. For exam-

---

**7.** Presumably, this was explaining *potentially* responsible and was meant to supplement the category of *responsible* parties who have already been found liable in prior actions under CERCLA.

**8.** The EPA promulgated the national contingency plan as a regulation pursuant to CERC-

LA § 105. It is codified at 40 CFR pt. 300 (1993).

**9.** CERCLA defines response costs as including both the costs of removing hazardous waste material and the cost of other types of remedial efforts designed to contain the contamination. 42 U.S.C. § 9601(25).

ple, if a landowner discovers that someone has surreptitiously dumped hazardous materials on his or her property and acts immediately to prevent those materials from contaminating the land, the landowner may subsequently sue the responsible party under section 107(a) for the cleanup costs. *Id.*

█ The nature of the defendants' liability, in a cost recovery action, is joint and several. *Id.* at 1240. *See, also, United States v. Colorado & Eastern R.R.,* 50 F.3d 1530, 1535–6 (10th Cir.1995). That means that the government may, in principle, sue one PRP for the entire cost of cleaning up a hazardous waste site, even if that PRP was only responsible for a small amount of the contamination.

However, a PRP who is sued (or who settles) under CERCLA can, in turn, seek contribution from other PRP's. Section 113(f)(1) provides that:

Any person may seek *contribution* from any other person who is *liable or potentially liable* under section 9607(a) [cost recovery] *during or following* any civil action under section 9606[or] 9607(a) of this title .... In resolving contribution claims, the court may allocate *response costs* among *liable parties* using such equitable factors as the court determines are appropriate. (Emphasis added.).

## C. THE CONTRIBUTION BAR

As the First Circuit explained in *United Technologies Corp. v. Browning–Ferris Indus., Inc.,* 33 F.3d 96, 100–1 (1st Cir. 1994), Congress intended CERCLA's contribution clause to be consistent with the standard legal doctrine of contribution,

which "permits a readjustment of liability [among jointly and severally liable parties] in accordance with the[ir] relative fault." *Jinwoong, Inc. v. Jinwoong, Inc.,* 310 F.3d 962, 966 (7th Cir.2002). A party who is a defendant in a lawsuit may implead other parties who it believes are also responsible. Fed.R.Civ.P. 14(a). Or, if the underlying substantive law permits, the party may pursue its own defenses vigorously, and then sue other responsible parties for contribution only after it is adjudged to be liable.

But, as discussed above, there is an important exception. CERCLA exempts SP's from being subject to further liability in contribution actions. Specifically, section 113(f)(2) provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement.

Viacom argues that Taylor's complaint should be characterized as one for contribution, not cost recovery. Viacom reasons that, under § 107(a), the owner of a hazardous waste site is a PRP. And, a PRP should not be able to sue an SP for cost recovery, either under CERCLA or under state law, because that would allow PRP's to evade the contribution bar.

The Court recognizes Viacom's point that the policy underlying the contribution bar is vital to CERCLA's overall scheme of "encourag[ing] responsible parties to come forward to settle CERCLA cases and perform the necessary cleanup work." [10] Brief in Support of Viacom's Motion for Summary Judgment ("D. Brief") at 3–4. As one court put it, "the

---

10. In recognizing this point, however, the Court also notes that the policy has limits. In particular, it does not apply to cost recovery claims brought by innocent parties. Congress certainly did not intend to force innocent parties to settle with the government, lest their right to seek direct cost recovery under section 107(a) be barred entirely.

carrot the EPA can offer potential settlors is that they no longer [have to] fear that a later contribution action by a non-settlor will compel them to pay still more money to extinguish their liability." *United States v. Union Gas Co.*, 743 F.Supp. 1144, 1152 (E.D.Pa.1990).

■ This Court is also persuaded that a defendant in a CERCLA lawsuit should not be able to evade the contribution bar by pursuing a state law contribution scheme (instead of a cause of action under section 113(f)(1)). *See, e.g., Crown Cork and Seal Co., Inc. v. Clark Equip. Co.*, 907 F.Supp. 147 (M.D.N.C.1995). But Taylor is not a defendant in a CERCLA lawsuit, or in any other lawsuit requiring a cleanup of the PCB's on its property. And the IELA is not, on its face, a contribution scheme. To the contrary, the IELA permits "any person" to sue to "recover the reasonable costs of a removal or remedial action." Thus, it most closely resembles a section 107(a) cost recovery claim.

Viacom attempts to circumvent this problem by arguing that CERCLA simply does not permit a PRP such as Taylor to bring a section 107(a) claim. Therefore, in Viacom's view, the only viable way to interpret Taylor's state law cause of action is as a subterfuge, designed by a party responsible for the contamination (*i.e.* Taylor) in order to obtain contribution from an SP (*i.e.* Viacom).

The fallacy in this argument is that it equates *potentially* responsible parties such as Taylor with *responsible* parties.

As such, it imputes liability upon Taylor, when no such liability has been determined.

Contribution is an action among parties who have been found to be liable for at least some portion of the damages alleged in the underlying lawsuit. Of course, an action for contribution may also be initiated by a party who is a defendant in a lawsuit (and therefore not yet liable). But once a person is sued, that person's *potential liability* is not merely hypothetical. A ruling on contribution, or relative fault, will not occur unless the defendant is first found to be liable during the course of the lawsuit.

Implicit in the claim by Viacom that Taylor's IELA suit is really one for contribution is an underlying presumption that Taylor has a right, under CERCLA, to sue Viacom for contribution.[11] Where does this right come from, given that Taylor has never been sued and has never admitted any liability for contaminating Taylor Farm? Viacom does not say. However, the Court can only think of two possible theories that (might) support Viacom's notion that Taylor would have had a right to seek contribution under CERCLA, if it had chosen to do so.[12] Either the Court must find that:

1) *Potential* defendants, at least in CERCLA cases, may initiate *preemptive actions* for contribution against other potential defendants, even before being sued for damages; or

**11.** The Court describes this as a "right" belonging to Taylor, but Viacom wants to use it as a constraint. Viacom's argument can be phrased as follows: Because the policy behind CERCLA requires that Courts interpret so-called cost recovery claims (whether brought under state or federal law) as contribution claims *whenever possible*, Taylor's claim should be treated as one for contribution. Understood in this way, Viacom's argument must fail, if it is not possible to treat Taylor's claim as one for contribution.

**12.** The Court recognizes that Taylor did not choose to do so because it was leery of the contribution bar. But that is a separate question. For the purpose of this inquiry, the Court ignores possible defenses, such as the contribution bar.

2) The facts in this case make clear that Taylor would have been found liable, if a section 106 or 107(a) suit had been brought.

■ The Court rejects the first theory as being unprecedented. It would permit parties to sue for contribution before they have suffered any legal harm. And, it would require courts to determine the relative fault of parties before making a finding that any of them are liable for damages at all. That would be tantamount to giving advisory opinions, something which Article III courts are not permitted to do.

Furthermore, section 113(f)(1) of CERCLA does not authorize preemptive contribution actions. It only authorizes a party who is *potentially liable* to seek contribution *during* a civil action, or alternatively, a party who is *found liable* under section 106 or 107(a) to seek contribution *following* that civil action. Viacom could try to argue that Taylor's IELA suit essentially meets the condition of being a civil action under 107(a). But that would put Viacom in the untenable position of arguing that, for the purpose of applying 113(f)(1), Taylor's IELA claim should be considered a 107(a) cost recovery action, but, for the purpose of applying 113(f)(2), Taylor's IELA claim should be considered a 113(f)(1) contribution action.

Besides, the procedural posture in this case does not fit section 113(f)(1). Taylor is the plaintiff in this action, not the defendant. Of course, a party like Taylor can initiate a contribution action, making it the putative plaintiff. But the party can only do so if it already has been found to be liable for damages in a previous action. In this case, there was a previous action involving Viacom, which culminated in the settlement agreement. But there was no such previous action involving Taylor.

It is significant that Viacom opens the *"ARGUMENT"* portion of its brief by exaggerating the extent of immunity provided by the contribution bar. Under heading I.A., Viacom states *"CERCLA § 113(f)(2) Protects Settling Parties from Being Sued Again."* D. Brief at 3. And then, in the first sentence, Viacom asserts unequivocally that CERCLA "provides protection for settling parties against claims regarding matters addressed in the settlement with the government." *Id.* Viacom thereby implies that section 113(f)(2) provides almost complete immunity for SP's. It does not. Section 113(f)(2) only provides immunity from suits initiated by other CERCLA defendants seeking contribution.[13]

To be sure, courts have consistently stated that the contribution bar must be interpreted broadly. For example, in *Akzo Coatings, Inc. v. Aigner Corp.*, the Seventh Circuit held that a claim, though well-pleaded as a cost recovery claim under CERCLA, is really a claim for contribution if the party making that claim has already been found to be partially liable (under § 106) and that party is, in effect, seeking to reduce its degree of liability. 30 F.3d 761 (7th Cir.1994). And, the Fifth Circuit held that when "one liable party sues another to recover its equitable share of the response costs, the action is one for contribution." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989).

---

**13.** In Viacom's brief, Viacom notes that ¶ 111(a)(2) of its Settlement Agreement with the United States and the State of Indiana contains much more sweeping protection from future liability. D. Brief at 13. It provides that the parties to the Settlement Agreement (being the United States and the State of Indiana) will not make any future claims against Viacom "arising under federal, state, or local law ... resulting from or relating to ... the release or threatened release of PCB's ... from" Neal's Landfill. But the Settlement Agreement is a contract which binds only the contracting parties, not Taylor.

In a similar vein, a number of district courts have held that a CERCLA defendant cannot use state law contribution schemes to evade the CERCLA contribution bar. *See, e.g., Dravo Corp. v. Zuber,* 804 F.Supp. 1182 (D.Neb.1992) (holding that a party who had been subject to an EPA cleanup order pursuant to section 106 could not sue an SP under a state common law contribution theory or an equitable subrogation theory); *United States v. Pretty Products, Inc.,* 780 F.Supp. 1488, 1494–96 nn. 3, 7 (S.D.Ohio 1991) (dismissing third party complaint initiated by a party being sued by the EPA, making claims under Ohio state law which it labeled as indemnity, breach of contract, quasi-contract, quantum meruit, and unjust enrichment, but which were really contribution claims); *Crown Cork and Seal Co., Inc. v. Clark Equip. Co.,* 907 F.Supp. 147 (M.D.N.C.1995) (dismissing counterclaims by defendant PRP seeking common law contribution and indemnity from plaintiffs who were SP's).

The facts of the *Akzo* case are particularly instructive to this Court. Akso was among approximately 200 firms that had generated hazardous wastes which were sent to various facilities within an industrial park now known as the Fisher–Calo site. *Id.* at 762. Among those facilities was the Two–Line Road facility where Akso admitted disposing of some hazardous materials. *Id.*

Akso performed initial cleanup work at the Two–Line Road facility in response to an Order issued by the EPA, pursuant to CERCLA § 106, 42 U.S.C. § 9606.[14] *Id.* at 762–3. The EPA then attempted to negotiate a comprehensive settlement for the entire Fisher–Calo site. *Id.* But Akso refused to participate, "after concluding that it was not liable for any contamination of the Fisher–Calo site beyond the Two–Line Road facility." *Id.* Aigner, on the other hand, was a member of the group that negotiated a broad settlement with the EPA. *Id.*

Thus, when Akso sued Aigner to recover some or all of the costs that it incurred in response to the initial Order from the EPA, Aigner moved to dismiss, arguing that Akso's complaint was barred by section 113(f)(2). *Id.* at 763. In response, Akso argued that section 107(a) permits "any person" to bring suit for the recovery of costs incurred in cleaning up a hazardous site, and therefore Akso believed that it was entitled to characterize its suit as one for cost recovery. *Id.* at 764. However, the Seventh Circuit held otherwise:

> Akso has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a). It is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. Instead, Akso itself is a party liable in some measure for the contamination at the Fisher–Calo site, and the gist of Akso's claim is that the costs it has incurred should be apportioned equitably amongst itself and the others responsible.

*Id.* Therefore, the Seventh Circuit held that Akso's claim was "quintessential[ly][a] claim for contribution." *Id.*

The difference between this case and *Akzo* is that Taylor has never been subject to any EPA order or lawsuit regarding the hazardous materials at Neal's Landfill or on the Downstream Property, and there has been no finding that Taylor caused or contributed in any measure to the contamination of Taylor Farm. Thus, whereas Akso could not (and did not) deny at least

---

14. This section, involving unilateral emergency orders by the EPA, is specifically mentioned in section 113(f)(1) as an appropriate predicate for a contribution action.

partial responsibility for the contamination of the Fisher–Calo site, Taylor can deny having any responsibility for the contamination that forms the basis for its IELA claim.

That leads the Court to the second possible explanation for Viacom's theory that Taylor's IELA claim should be treated as a contribution claim. Viacom seems to believe that Taylor's legal responsibility under CERCLA for the contamination of· the downstream portion of Taylor Farm is undeniable. In Viacom's own words:

> [Taylor] clearly is a responsible party under CERCLA. Taylor ... is the owner of the property ... As such, Taylor ... is subject to liability under Section 107(a) of CERCLA ... Furthermore, ... William Taylor, [Taylor Farm's] predecessor owner, was directed by [the EPA] to respond to the releases of hazardous substances from Neal's Landfill, but refused to do so and clearly was a liable party under CERCLA. In 1981, [the EPA] informed William Taylor [of the] "substantial threat of discharge of ... [PCB's] ..." and requested that he ... eliminate the threat. In addition, [the EPA] notified William Taylor in 1982 that the "EPA has determined that there have been and continue to be actual releases of [PCB's] at the Neal's Landfill site, which you own," and advised him of his liability therefore.[15] Every dollar Viacom has spent addressing releases at and from Neal's Landfill has reduced the potential liability of [Taylor] and its predecessor owners.

D. Brief at 10–11 (citations omitted).

Thus, Viacom appears to be asking this Court to first find that Taylor is liable under CERCLA (even though it has not yet been sued), and then conclude, as a matter of law, that this unpursued or hypothetical liability is sufficient to trigger the contribution bar. If so, Viacom's legal proposition is highly questionable. It is one thing to argue that Taylor probably would be found liable, if sued; it is another thing to argue that Taylor probably would be sued, given the fact that in the intervening twenty years since the EPA first served notice to Wm. Taylor that he was a PRP, neither the EPA nor any other party has attempted to sue him or his successors to establish that he was actually a responsible party.

Courts do not make hypothetical determinations about liability. If Viacom truly believed (and still believes) that Taylor is liable for some part of the contamination addressed in Viacom's settlement agreement, then Viacom's proper course of action would have been to counterclaim against Taylor under section 113(f)(1) of CERCLA (which imputes liability according to the terms of section 107(a)). Viacom did not do so.[16]

However, even if Viacom had chosen to sue Taylor for contribution, the Court is not convinced that the facts in the record are such as to justify summary judgment in Viacom's favor. As the quotation above suggests, Viacom believes that Taylor ought to be treated as a responsible party for two reasons. First, according to Viacom, the current owner of a hazardous waste site is automatically responsible for the contamination. Second, according to Viacom, Taylor is further implicated be-

---

**15.** More accurately, the EPA advised him that, as landowner, he *might* be held liable.

**16.** Obviously, suing Taylor for contribution would not have served Viacom's purpose, which was to invoke the contribution bar without actually having to prove that Taylor was a jointly and severally liable party.

cause: (a) Taylor (or more precisely, Taylor's predecessor) received · notification from the EPA in 1981 and again in 1982 that it *might* be held liable for cleaning up hazardous materials on the land; and (b) Taylor was the direct financial beneficiary of Viacom's cleanup efforts under the settlement agreement.

■ The Court is not persuaded. In the first place, being the current owner of a hazardous waste site does not make Taylor automatically liable for response costs under CERCLA. At a minimum, Taylor is entitled to the innocent landowner defense set forth in section 107(b).[17] The language of that defense is quite complicated, depending in part upon how and when the land was obtained. It requires the court to weigh a number of factors in determining the landowner's guilt or innocence. But in general terms, it states that the owner of a hazardous waste site is not liable for any response costs under CERCLA, if he or she did not know that hazardous materials had been deposited at the site at the time he or she purchased the land and if he or she exercised the kind of diligence to find out that would have been appropriate at the time of the purchase. 42 U.S.C. § 9607(b)(3); 42 U.S.C. § 9601(35)(B) ("Reason to Know").

■ The parties appear to agree, and the Court concurs, that the relevant time of purchase for applying section 107(b) is either 1977 (when Wm. Taylor first signed an installment land-sale contract) or 1980 (when Wm. Taylor obtained the deed for the parcel of land containing Neal's Land-

fill), not 1997 (when the land ultimately passed to his son's limited liability company). This is because CERCLA does not consider a transfer "by inheritance or bequest" to be the type of land transfer that requires a new analysis under section 107(b). 42 U.S.C. § 9607(b)(3); 42 U.S.C. § 9601(35)(A). That being so, the letters from the EPA to Wm. Taylor in 1981 and 1982 have no bearing upon the question of ˙what Taylor knew or should have known when the land was acquired. Of course, there can be no doubt that Wm. Taylor knew or should have known that the property he purchased contained a landfill. But there is no evidence in the record that Wm. Taylor had any reason to know that hazardous materials had been disposed of there in the late 1960's.

Still, Viacom implies in its Reply Brief that the burden lies with Taylor to explain why Wm. Taylor was an innocent purchaser. Viacom Inc.'s Reply Brief in Support of Motion for Summary Judgment ("D. Reply Brief") at 3 ("Plaintiff does not even argue they [sic] qualify as 'innocent purchasers.' "). Granted, CERCLA's statutory scheme establishes that it is an *affirmative defense* for a CERCLA *defendant* to claim that it exercised due diligence at the time of its purchase. Thus, if Taylor stood accused of being responsible for the contamination, and if Taylor's accuser first established that Taylor was potentially liable according to section 107(a), the burden would then lie with Taylor to show concretely why it is entitled to the statutory defense laid out in section 107(b).

---

**17.** The Court is well aware that, if Congress had said nothing, the common law doctrine of *caveat emptor* could have been used to justify the imposition of automatic liability upon the current landowner. *See, e.g., Alcan–Toyo America, Inc. v. Northern Illinois Gas Co.,* 881 F.Supp. 342, 347 (N.D.Ill.1995), in which the doctrine played a role in the Court's equitable considerations about relative fault with regard to a contribution claim. However, section 107(b) of CERCLA clearly provides for the possibility that the current landowner may be innocent of all liability. Thus, the statute does not impose a strict regime of *caveat emptor.*

But that is not the procedural posture of this case. As the Court has already pointed out, Taylor has never been accused of liability for any part of the contamination at Taylor Farm. Nor is Taylor a defendant in the current lawsuit. Therefore, Taylor had no reason to invoke section 107(b) in order to defend itself from liability.

■ Indeed, as explained above, Viacom's only purpose in questioning Taylor's right to invoke the statutory defense is to further persuade this Court that Taylor's lawsuit against Viacom is more like a contribution claim than a cost recovery claim. Viacom's legal theory is predicated upon establishing that Taylor is not an innocent landowner. As such, the Court finds that the burden of production and persuasion lies with Viacom, not Taylor. The Court further finds that Viacom has failed to meet its burden.

In reaching this conclusion, the Court cautions that it has not made a finding that Wm. Taylor did, in fact, meet the statutory criterion for being an innocent landowner. The Court is merely saying that Viacom has not established sufficient evidence as to leave a fact-finder with no alternative but to conclude that he was not innocent.

At the time that Wm. Taylor purchased the Neal property, he was aware of the landfill. It certainly can be argued that this created a duty to investigate further. However, Taylor's original lease-purchase contract for the land pre-dated the CERCLA statute. At that time, the Court cannot say, as a matter of law, that any purchaser of a landfill should have been put on notice to perform a full-scale environmental investigation. Because Viacom has presented no other evidence that Wm. Taylor knew or should have known about

the hazardous waste at the time he purchased the land, the Court finds that there is still a question of fact as to whether Taylor would be entitled to the defense established in section 107(b), if sued under section 107(a).

Moreover, the Seventh Circuit has established an "innocent landowner exception" to the contribution bar that is (arguably) even broader than the statutory defense.[18] In *Rumpke of Indiana, Inc., v. Cummins Engine Company, Inc.*, the Seventh Circuit held that the current landowner Rumpke, as a PRP, could sue a group of SP's (the "Cummins group") for cost recovery under section 107(a). 107 F.3d 1235, (7th Cir.1997).

The land in question was a 274–acre dump known as the Uniontown Landfill, which Rumpke purchased in 1984. *Id.* at 1236–7. At the time of purchase, the previous owners informed Rumpke that the landfill had never accepted hazardous waste, but Rumpke did not conduct its own environmental investigation and, as it turned out, "a cocktail of hazardous wastes had been deposited at Uniontown for many years." *Id.*

In addition, other toxic waste had "migrated" there from a site about ten miles away known as the "Seymour site" and described by the Seventh Circuit as "an environmental disaster area." *Id.* The Seymour site contained some 60,000 drums and 98 bulk storage tanks that were in various stages of decay—leaking, exploding, and sending clouds of toxic chemicals into the air. *Id.*

In 1982, the EPA entered into a settlement agreement with the Cummins group to clean up the hazardous waste at the Seymour site. *Id.* In 1990, Rumpke dis-

---

**18.** As explained below, the Court actually believes that the innocent landowner exception is not broader than the statutory defense, it is just different because it applies to plaintiffs, not defendants in a CERCLA action.

covered that the Uniontown Landfill was also contaminated, and that some of the drums from the Seymour site had come to be deposited in the Uniontown Landfill. Therefore, Rumpke brought suit against the Cummins group under CERCLA. *Id.*

Rumpke's suit alleged separate Counts for cost recovery under section 107(a) and contribution under section 113(f)(1). The Cummins group moved for summary judgment, "reason[ing] that: (1) the Rumpke suit [really] presented 'claims for contribution,' and (2) the claims were 'matters addressed in the settlement,' " wherefore both of Rumpke's claims should be barred by section 113(f)(2)." *Id.* at 1237–8.

The trial court "found that it was factually uncertain whether Rumpke was entitled to invoke the *Akzo* [innocent landowner] exception, and ... denied summary judgment for the Cummins group on that point." *Id.* at 1238. But the trial court then found, as a matter of law, that the settlement agreement only addressed the Seymour site and did not address contamination of the Uniontown Landfill. *Id.* Therefore, the trial court found that the contribution bar did not apply to either of the Rumpke's claims and awarded summary judgment to Rumpke. *Id.*

On appeal, the Seventh Circuit decided to address the innocent landowner exception first, before deciding if it was necessary to address the trial court's opinion about the scope of the Seymour settlement agreement. *Id.* at 1239. The Seventh Circuit began its discussion by noting that "Rumpke is not a party that is now or ever has been subject to a civil action [by any public authority] under CERCLA § 106." *Id.* The Seventh Circuit subsequently noted that "[i]t is also undisputed that no party has ever brought a cost recovery action against Rumpke under § 107." *Id.* Therefore, Rumpke's "status as a PRP ... is based solely on its ownership of the

Uniontown site—ownership, we assume at this stage, it acquired without knowledge of the presence of environmental hazards and after all the [hazardous] deposits had been made." *Id.*

Accordingly, the Seventh Circuit characterized the determinative issue as whether: "a landowner PRP [may] bring a direct liability suit for cost recovery under § 107(a) against other PRP's ..., if it contributed nothing to the hazardous conditions at the site." *Id.* at 1239–40. The Seventh Circuit concluded in the affirmative. *Id.* at 1241. "[L]andowners who allege that they did not pollute the site in any way may sue for their direct response costs under § 107(a)." *Id.* To hold otherwise "would come perilously close to reading § 107(a) itself out of the statute." *Id.*

For the sake of completeness, the Seventh Circuit also considered "whether the contribution bar ... has any role to play in a [true] cost recovery action under § 107(a)." *Id.* at 1242. The Seventh Circuit held that it did not. *Id.* Cost recovery serves a different purpose from contribution in the statutory scheme. *Id.* Therefore, the contribution bar only applies to claims that are truly contribution claims. *Id.* A cost recovery claim may target matters directly addressed by a settlement agreement without precipitating the contribution bar.

■ It is obvious that the facts in *Rumpke* are quite similar to the case before this Court. Taylor is a landowner who has never been sued under sections 106 or 107 of CERCLA. No evidence has been offered that Taylor contributed in any way to the pollution of Neal's Landfill. Therefore, the central holding in *Rumpke* applies. Taylor has a right to bring a suit against Viacom for response costs under section 107(a). The fact that Taylor chose to bring its suit under the IELA makes no

difference. Taylor's purpose is still to recover the response costs it will incur in cleaning up its property.

Nevertheless, Viacom argues that *Rumpke* is distinguishable. In Viacom's own words:

> [T]he Seventh Circuit made clear [that] the 'central issue' in *Rumpke* was whether the 'matters addressed' in a prior consent decree at the Seymour site barred Rumpke's CERCLA claim for costs at the Uniontown site .... 107 F.3d at 1236. In the course of holding that the Seymour decree did not address matters at the Uniontown site and therefore did not protect settlors in the Seymour decree from Rumpke's suit, the Seventh Circuit briefly discussed certain differences between CERCLA § 107 and § 113(f)(1).

D. Reply Brief at 5–6.

This is an inaccurate characterization of the Seventh Circuit's opinion. The Seventh Circuit acknowledged that the central issue addressed by the trial court in *Rumpke* was whether the settlement agreement at the Seymour site was sufficiently broad as to justify applying the contribution bar at the Uniontown site. *Rumpke*, 107 F.3d at 1238, 1239. But the Seventh Circuit also explicitly disavowed the notion that that was the central issue in the case. *Id.* at 1239. The central issue, according to the Seventh Circuit, was the innocent landowner exception to the contribution bar. *Id.* at 1240. In that regard, the Seventh Circuit did not just mention the "differences between CERCLA § 107 and CERCLA § 113(f)(1)" in passing. The Seventh Circuit discussed those differences at great length, because they form the basis for the exception. *Id.* at 1239–42.

Still, Viacom insists that the Seventh Circuit's holding should be limited to the facts of the case, most particularly, the fact that Rumpke did not benefit from the cleanup efforts undertaken by the Cummins group in accordance with the Seymour settlement. D. Reply Brief at 6. By contrast, nearly every dollar spent by Viacom in cleaning up Neal's Landfill benefitted Taylor. Thus, Viacom seems to be arguing that when a landowner has already benefitted in some significant amount from the cleanup activities of the defendant, the landowner cannot sue the defendant for cost recovery, only for contribution.

The Court cannot find any support in the text of *Rumpke* for this argument. The Seventh Circuit did not base its reasoning upon equitable considerations. Nor is Viacom's argument inherently persuasive. The fact that a landowner may have benefitted from another party's cleanup efforts, undertaken subsequent to the landowner's purchase of the land, might affect a court's apportioning of liability in a contribution action, but it has no bearing upon the initial question of whether that landowner was "innocent" at the time of purchase.

It is certainly possible that equitable considerations played a role in the trial court's determination that Rumpke's suit addressed matters not covered in the Seymour agreement. After all, the fact that Rumpke, as the owner of the Uniontown site, obtained no economic benefits from the cleanup of the Seymour site makes it hard to argue that Rumpke's suit regarding the Uniontown site somehow addressed matters covered in the Seymour agreement. But, even so, the trial court's reasoning has little precedential value because the Seventh Circuit did not endorse it.

Moreover, if there were any remaining doubt, after *Rumpke*, that the Seventh Circuit did not intend for economic consid-

erations to play a role in the innocent landowner exception, those doubts should have been dispelled by *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342 (7th Cir. 1997).

Datacard purchased a site in 1985 that previously had housed a "tank farm." *Id.* at 1345–6. Datacard conducted an environmental audit and discovered significant contamination at the site. *Id.* at 1346. "Despite th[at] find, Datacard went ahead with the purchase, figuring it had a good shot at recovering the cleanup costs" from AM International ("AMI") and that, in any event, the cleanup costs would constitute only a small percentage of the overall purchase costs. *Id.*

After the purchase, Datacard cleaned up the contaminants that it had discovered. It then filed an action for cost recovery against AMI. *Id.* The trial court found that Datacard was entitled to response costs. AMI appealed, arguing, much like Viacom has argued here, that "[o]nly innocent parties ... can sue under § 107(a)(4)(B)." *Id.* at 1346–47. According to AMI, landowners such as Datacard may only bring contribution actions to recover the appropriate share of their cleanup costs.[19] *Id.*

The Seventh Circuit unequivocally rejected this argument:

> In *Akzo* ..., we noted if a landowner faces liability solely because a third party spilled or allowed hazardous waste to migrate onto its property, the landowner may directly sue for its response costs. In this case, Datacard presumably *paid less* for [its purchase] *because it knew it was buying into an expensive cleanup*. While that may have rendered Datacard *a little less 'innocent'* than the landowner in *Akzo,* Datacard did not take part in [contaminating the land]. Instead, Datacard, like the party forced to clean up contamination on its property due to a third party's spill, faces liability merely due to its status as a landowner. As a result, Datacard qualifies under *Akzo's* exception and can directly pursue its response costs.

*Id.* (emphasis added).

There has been some suggestion that other circuits do not recognize an "innocent landowner exception." For example, Viacom cites *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.,* which states that: "Every circuit that has addressed the question ... has held that parties such as Axel who are potentially responsible for cleanup costs under § 107 cannot bring § 107 cost recovery actions; rather, such parties 'must seek contribution' under § 113." 191 F.3d 409, 415 (4th Cir.1999) (*citing* cases from six other circuits in support, but conspicuously omitting the cases discussed above from the Seventh Circuit). Similarly, in *New Castle County v. Halliburton NUS Corp,* the Third Circuit observed that: "Every court of appeals that has examined this issue has come to the same conclusion ... An action brought by a potentially responsible person is by necessity a section 113 action for contribution." 111 F.3d 1116, 1120–1 (3rd Cir.1997).

But, as this Court has already noted, both the Third and Fourth Circuits use a much narrower definition of PRP than the Seventh Circuit. The Fourth Circuit only considers a person to be a PRP if that person has already been found to be a responsible party or is currently a defendant in a CERCLA lawsuit. *Pneumo Abex Corp. v. High Point, Thomasville and Denton R. Co.* 142 F.3d 769, 773 n. 2

---

19. This argument was significant not because AMI sought to apply the contribution bar, but because AMI sought to apply the statute of limitations, which is much shorter for a contribution claim.

(4th Cir.1998). The Third Circuit only considers a person to be a PRP if that person is subject to liability under section 107(a) and has been found not to be entitled to the statutory defenses of section 107(b). *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1120 n. 2 (3d Cir.1997)

In the *Axel* case, it was uncontested that Axel Johnson had buried lead-contaminated wastes at various locations on its property and that it had previously settled with the EPA after a section 106 action had been initiated against it. 191 F.3d at 412–3. The Fourth Circuit ruled that these acts precluded Axel Johnson from claiming that it was an innocent landowner and thereby bringing a section 107(a) cost recovery action against Carroll Carolina Oil.

In the *New Castle* case, it was uncontested that New Castle County had owned and operated the landfill at the time hazardous materials were disposed of there and that it had previously settled with EPA after a section 106 action had been initiated against it. 111 F.3d at 1119. The Third Circuit held that New Castle County was not an innocent landowner and could not bring a section 107(a) cost recovery action against another allegedly responsible party.

All of the other circuits that have addressed this issue have been more circumspect about their holdings. For example, in *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, the Sixth Circuit held that "parties who themselves are PRPs, potentially liable under CERCLA *and compelled to initiate a hazardous waste site cleanup*, may not bring an action for joint and several cost recovery, but are

limited to actions for contribution governed by the mechanisms set forth in CERCLA § 113(f)." 153 F.3d 344, 356 (emphasis added). In *United States v. Colorado & Eastern R.R.*, the Tenth Circuit held that any action by a PRP who was *a defendant* in a cost recovery action was a claim "by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make," and was "the quintessential claim for contribution." 50 F.3d 1530, 1536 (10th Cir.1995). And, in *Redwing Carriers, Inc. v. Saraland Apartments*, the Eleventh Circuit held that any claim by a *responsible* party against other allegedly responsible parties is quintessentially one for contribution. 94 F.3d 1489, 1496 (11th Cir.1996).[20]

The bottom line is that this Court does not know of any case in which an erstwhile plaintiff, who has never been the subject of a prior action under CERCLA 106 or 107, has never entered into a voluntary settlement with the EPA, and has not been found to have contributed to the actual contamination of the land, was nevertheless barred from bringing a cost recovery action, merely because that plaintiff was *potentially* responsible for some of the contamination. Therefore, in this Court's view, the apparent differences between the circuits can be reconciled.

Before doing so, however, it is helpful to recognize that the "innocent landowner exception" is something of a misnomer. It is not an "innocent landowner defense." The Seventh Circuit has never held that a landowner who is a *defendant* in a section 107(a) lawsuit is entitled to defend against liability merely by arguing that he or she

**20.** It is significant that the Eleventh Circuit concluded that Redwing was a "responsible party," even though Redwing formally denied any liability. The Eleventh Circuit found that (a) Redwing had previously entered into an

"administrative order by consent" with the EPA, and (b) Redwing "cannot deny it originally disposed of most, if not all, of the hazardous substances now contaminating the Site."

never disposed of hazardous materials at the site.[21]

Moreover, it is not literally an "exception," in the sense of being a court-made exception to some general legal principle. Rather, it constitutes a recognition by the Seventh Circuit that there is a logical gap between two CERCLA rules. The one rule is that a responsible party (under CERCLA § 106 or 107(a)) may not bring an action for direct recovery of costs, but rather must file a claim for contribution. The other rule is that the current owner of a hazardous waste site is a potentially responsible party, subject to being sued under CERCLA § 106 or 107(a). Naturally, Viacom would like this Court to gloss over the difference between a potentially responsible party and a responsible party, and put these rules together to conclude that the owner of a hazardous waste site is *per se* barred from bringing a cost recovery action under section 107(a), merely because of his or her status as the landowner. But the rules do not logically fit together in this way. A landowner need not be a responsible party.

Under the common law of contribution, only a defendant in a lawsuit, or a party who has already been found liable in a previous action may bring a claim for contribution. In particular, a "potentially innocent" landowner such as Taylor who is the plaintiff in a CERCLA lawsuit would not even be entitled to bring a claim for contribution, except perhaps by (cynically) admitting liability as part of his or her pleadings. If such a landowner were also barred by CERCLA from bringing an action for cost recovery, the landowner would have no legal recourse at all.

In this Court's opinion, that is the essence of the Seventh Circuit's innocent landowner exception. It does not guarantee that a landowner who alleges that he or she did not contribute to the contamination of the land is innocent under the CERCLA statute. It merely guarantees that such a landowner will be able to have his or her day in court.

Of course, that does not preclude Viacom from putting on, as its defense, a theory that Taylor should be held liable for the contamination, too. If Viacom can prove this point at trial, the innocent landowner exception would no longer apply, and Viacom could then contend that the contribution bar blocks Taylor's action.

But, at this time, Viacom has presented no such evidence to this Court. The fact that the EPA sent form letters to Wm. Taylor in 1981 and 1982 notifying him that he had been identified as potentially liable is not enough. Neither the EPA nor anyone else has ever brought suit or implemented a unilateral administrative order against Wm. Taylor (or his successors) regarding the cleanup of hazardous materials on the land. Nor did Wm. Taylor (or his successors) ever voluntarily agree to conduct cleanup operations at the EPA's behest. Therefore, taking the facts in the light most favorable to the non-moving party, Taylor is an innocent landowner entitled to bring a cost recovery action against Viacom.

---

**21.** In fact, CERCLA107(b) provides that one of the factors in determining whether a defendant landowner is innocent is to examine "the relationship of the purchase price to the value of the property, if the property was not contaminated." *See* 42 U.S.C. § 9601(35)(B)(iv)(I) ("Interim Standards and Practices [for] Properties Purchased Before May 31, 1997"). That means that courts are required to take some economic considerations into account when applying the (statutory) innocent landowner defense. By contrast, the Seventh Circuit made clear in *Datacard* that the purchase price is not relevant when applying the innocent landowner exception to the contribution bar.

## D. THE JURISDICTION BAR

Viacom's alternative argument is that Taylor's IELA suit should be subject to CERCLA's jurisdiction bar. Once again, this argument is problematic because the jurisdiction bar, on its face, only restricts federal courts from "exercising jurisdiction under Federal law," not from exercising jurisdiction on the basis of diversity of citizenship 42 U.S.C. § 9613(h). Taylor has brought its claim under state law. Therefore, section 113(h) ought not to apply.

The only way for Viacom to avoid this result is to assert, again, that Taylor's claim is equivalent to a CERCLA claim; whence, Taylor is really asking this Court to exercise federal question jurisdiction. That argument is dubious because Taylor is not the party that asked this Court to exercise jurisdiction at all. It was Viacom who sought to remove the case from state court.

But this Court need not address that issue because there is a deeper flaw in Viacom's argument. Either, Viacom must admit that Taylor's claim is a valid state law claim, in which case section 113(h) does not apply because this Court is appropriately exercising diversity jurisdiction, or Viacom must insist that Taylor's IELA claim is really a subterfuge, in which case, the Court must again ask: Subterfuge for what?

As the Court has already explained, if one assumes that Taylor is an innocent landowner, Taylor's claim most closely resembles a CERCLA 107(a) cost recovery action. If, on the other hand, one assumes Taylor is a responsible party, it most closely resembles a contribution claim. The

Court has already found that there is a question of fact as to which of these is most apt. Thus, viewing the facts in the light most favorable to Taylor, the Court must assume that Taylor's claim is one for cost recovery under CERCLA.

■ All of this assumes that Taylor's claim raises a federal question at all. Otherwise, Viacom's argument that Section 113(h) "blunt[ly] withdraw[s] federal [question] jurisdiction" would not make sense. D. Brief at 14 (*quoting North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991)). But, section 113(h) also lists five exceptions wherein CERCLA does not require the blunt withdrawal of federal question jurisdiction. The first exception is for any "action [brought] under section 9607 of this title to recover response costs or damages or for contribution." Thus, even granting that Taylor's IELA claim is a subterfuge for a CERCLA claim, this Court would still have to conclude that, viewing the facts in the light most favorable to Taylor, the jurisdiction bar does not apply.[22]

The Court finds that this argument is sufficient, in and of itself, to invalidate Viacom's attempt to invoke the jurisdiction bar. On the one hand, if Taylor's IELA claim is truly a state law claim, then the Court is permitted by section 113(h) to exercise diversity jurisdiction. On the other hand, if Taylor's IELA claim is truly a federal law claim, then this Court is not barred from exercising federal question jurisdiction because the first exception to section 113(h) unequivocally exempts claims for cost recovery.

---

22. The statute is more ambiguous with respect to contribution claims. The first exception seems to exclude them from the scope of the jurisdiction bar, but it also limits that exclusion to claims brought under section

107. However, the Court need not address that issue because, for purposes of this summary judgment motion, Taylor's IELA claim is not a disguised contribution claim.

However, the Court recognizes that Viacom has cited an important precedent in which a state law claim was found to be barred by section 113(h). In *Indiana Department of Environmental Management v. Conard*, the Indiana Supreme Court held that *collateral attacks* on a CERCLA settlement agreement are impermissible. 614 N.E.2d 916 (Ind.1993).

The holding in *Conard* may be viewed as an exception to the general rule that federal courts are entitled to exercise diversity jurisdiction over state law claims involving hazardous wastes. Or, it may be viewed as an example where a court has found that a state law claim was really a subterfuge for a federal law claim. But, either way, the case is distinguishable because the Conards, who are neighbors of the Taylors, were not seeking cost recovery. Rather, they were seeking to overturn the issuance of a state permit that was necessary for Viacom to construct the spring-treatment plant required by the same Settlement Agreement that is at issue in Taylor's lawsuit. Because the permit was necessary for the implementation of Viacom's agreement with the EPA, the Indiana Supreme Court held that the Conards' attempt to block the issuance of the permit was an impermissible backdoor or collateral attack on that agreement.

Viacom now asks this Court to extend that holding to bar a much wider range of state law claims. According to Viacom, "[s]ection 113(h) of CERCLA broadly prohibits any lawsuit under federal or state law that impinges upon a removal or remedial action selected by [the EPA] under CERCLA." D. Brief at 13. The Court respectfully disagrees with this characterization.

In the first place, Viacom's use of the word "impinges" implies that the jurisdiction bar has the same broad scope as the contribution bar, covering any and all matters that have been, in some way, addressed by Viacom's settlement agreement. But the fact is that the jurisdiction bar uses very different language from the contribution bar. It denies jurisdiction only with respect to lawsuits that, in effect, ask a federal court to "review [a] challenge[ ] to [a] removal or remedial action selected under section 9604[or] 9606(a) of this title." 42 U.S.C. § 9613(h).

The underlying policy is to ensure that necessary environmental cleanups proceed more swiftly, without being delayed by third party lawsuits intended to challenge them. *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir.1991) (The purpose is "to prevent litigation from delaying remediation."); *accord, U.S. v. State of Colorado*, 990 F.2d 1565, 1576 (10th Cir. 1993) ("Congress' expressed purpose in enacting § 9613(h) was to 'prevent *private responsible parties* from filing dilatory interim lawsuits which have the effect of slowing down or preventing the EPA's cleanup activities.' ") (*quoting* from H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 266 (1985), *reprinted* in 1986 U.S.C.C.A.N. 2835, 2941). That policy differs sharply from the policy underlying the contribution bar, which is to provide an economic incentive for responsible parties to come forward and settle with the government.

In the second place, the jurisdiction bar does not apply *broadly* to *state law* environmental claims regarding hazardous waste sites. If it did, parties like Viacom would routinely respond to such claims by first seeking to remove them to federal court, and then seeking to have them automatically dismissed because of the jurisdiction bar. The Court does not believe that was Congress' intention. Why would Congress have begun section 113(h) by explicitly and prominently excluding state law claims brought under diversity, if it really intended for the jurisdiction bar to apply

to a broad range of such cases? Furthermore, a broadly interpreted bar to diversity jurisdiction would fly in the face of the express language of section 114(a): "Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a).

Congress did not define what constitutes a "challenge" to a remedial action under section 113(h). However, various courts have referred to claims that "would interfere" with or "delay[ ] the prompt cleanup" of hazardous sites, *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1019, 1024 (3d Cir. 1991), claims that would require the court to "alter the ongoing response activities," *Reynolds v. Lujan*, 785 F.Supp. 152, 154 (D.N.M.1992), or claims that would prevent or delay the implementation of "a measure that is ordered as part of a remedial plan, and that is reasonably related to the plan's objectives." *North Shore*, 930 F.2d at 1244.

Viacom has presented no evidence to this Court that Taylor's claim, if upheld, will do any of these things. As Taylor has argued in its brief, "[t]he remedy sought by Taylor ... may relate to PCBs that originally were dumped by Viacom within Neal's Landfill, [but it] will *not* interfere with any ongoing work ordered by the EPA." P. Brief at 19.

In its brief, Viacom argues vigorously that, because its remediation efforts under the Settlement Agreement are "still not complete," D. Brief at 16–20, it "cannot be forced to perform removal or remedial action work with respect to the so-called Downstream Property." D. Brief at 20. But, other than monitoring, Viacom has failed to identify any concrete uncompleted remediation task that it remains committed to perform. Moreover, the proper legal question is not whether Viacom's remediation tasks have all been completed, but whether Taylor's lawsuit, if successful, is likely to impede one or more of the (allegedly) incomplete tasks.

To that end, Viacom points to three types of supposedly ongoing response activities for which continues to be responsible. First, Viacom notes that it still must monitor the site. D. Brief at 18. But, in *Frey v. Environmental Protection Agency* the Seventh Circuit held that merely monitoring an otherwise completed cleanup is not sufficient to justify an application of the jurisdiction bar. 270 F.3d 1129, 1134 (7th Cir.2001). And, in any event, this Court does not see why Taylor's lawsuit would prevent Viacom from monitoring the site.

Second, Viacom points out that it still must negotiate with the EPA over the possibility of further remediation efforts (depending in part upon the results of monitoring). D. Brief at 18. But Viacom, in fact, opposes any attempt to require it to perform more cleanup activities, and the *Frey* Court has stated that a lawsuit cannot be barred under section 113(h) by the "mere[ ] hypothetical possibility [of] a follow-up remediation plan." 270 F.3d at 1134. According to the Seventh Circuit, section 113(h) requires "concrete, existing remedial measures," not hypothetical ones. *Id.*

Third, Viacom points out that the *original* Settlement Agreement, in paragraph 51(g), ostensibly obligates Viacom to perform additional sediment removal from Richland Creek. D. Brief at 18. But, based upon the facts before this Court, that obligation has been obviated by the *amended* Settlement Agreement, due to the impossibility of incinerating the Richland Creek sediment as was required by the original Settlement Agreement. Moreover, Viacom has not explained why

Taylor's lawsuit would *prevent* or *delay* Viacom from cleaning up Richland Creek, rather than encouraging Viacom to do so.

About the only sense in which Taylor's lawsuit can be said to "challenge" Viacom's settlement agreement with the EPA is that, if Taylor is successful, Viacom will be required to spend more money to clean up the land for Taylor's benefit, than the EPA required Viacom to spend for the public's benefit. The Court finds that that is not enough to bar Taylor's claim. If it were, then any party which enters into a settlement agreement would thereby obtain complete immunity from all other lawsuits regarding matters addressed in the settlement agreement (or at least from all other lawsuits that might require the SP to spend more money). The language of CERCLA provides no support for such sweeping immunity.

Viacom has cited three federal cases in its effort to show that the jurisdiction bar has a broad reach. D. Brief at 13–15. Two of these cases involved citizen action suits. *See Reynolds v. Lujan,* 785 F.Supp. 152 (D.N.M.1992) (barring a citizen suit against the federal Bureau of Land Management seeking to impose additional hazardous waste disposal requirements upon cleanup activities already being undertaken by the Bureau) *and Schalk v. Reilly,* 900 F.2d 1091 (7th Cir.1990) (barring a citizen suit against the EPA seeking to prevent the incineration of PCBs that was required by the original Settlement Agreement at issue in this case).

Section 159 of CERCLA authorizes any citizen to act as a private attorney general in an attempt to enforce the CERCLA standards. 42 U.S.C. 9659. But these suits are very different from cost recovery actions because a citizen acting as a private attorney general need not have suffered any harm and is not, in any case, suing for cost recovery or damages.

*Id.* Moreover, with respect to the jurisdiction bar, citizen suits are impacted by the (much narrower) fourth exception to section 113(h), rather than the first. The result is that the jurisdiction bar does have a broader reach in the context of citizen suits. Federal courts generally are barred from exercising jurisdiction over a claim brought under section 159 until the remedial efforts addressed in that suit have been completed. 42 U.S.C. 9613(h).

But Taylor's suit cannot reasonably be characterized as a citizen suit. Taylor is not attempting to address general environmental concerns in the public interest. Taylor is attempting to protect its own financial interests through cost recovery. Therefore, even though Taylor is technically entitled to bring a citizen suit, Taylor's IELA claim is really one for cost recovery (or contribution, if Viacom can show that Taylor is not innocent).

That leaves only *North Shore Gas Co. v. EPA,* 930 F.2d 1239 (7th Cir.1991) as being relevant to this case. North Shore Gas Company ("North Shore") was a PRP at a waterfront site that was identified by the EPA as a hazardous waste site. *Id.* at 1241. That site overlapped a second waterfront hazardous waste site, for which the EPA had already negotiated a settlement. *Id.*

As part of the settlement, Outboard Marine Corporation ("Outboard"), the settling party, was required to convert one of its boats slips into a hazardous waste facility and authorized to construct a new slip in the part of the site which overlapped with North Shore. *Id.* North Shore objected to the settlement agreement, in large part because the presence of the new boat slip would significantly increase the expense of cleaning up its own hazardous waste site. *Id.* Therefore, North Shore sued seeking to enjoin the construction of the new boat slip. *Id.*

The Seventh Circuit found that the construction of the new boat slip was an integral part of Outboard's remediation plan and that, if Outboard was not able to satisfy its customers by constructing the alternative boat slip, there would likely be considerable delays in implementing the overall cleanup plan. *Id.* at 1244. Therefore, the Seventh Circuit held that North Shore's suit was an impermissible challenge to a settlement agreement. *Id.*

This Court recognizes that North Shore's underlying concern was really about its own potential cleanup costs. But that does not mean that *North Shore* stands for the broad proposition that federal courts do not have jurisdiction to hear claims by potentially innocent landowners suing settling parties for cost recovery. The Seventh Circuit explicitly warned against just such a generalization, noting that "in such a case, section 113(h) would be doing a good deal more than affecting the 'timing' of judicial review; it would be extinguishing judicial review." *Id.* at 1245.

On its face, North Shore's suit was not one for cost recovery. North Shore sought to enjoin, *i.e.* prevent, the implementation of one of the terms of Outboard's comprehensive settlement agreement with the EPA. As such, the *North Shore* court found that it was barred from exercising jurisdiction by section 113(h) of CERCLA.

By contrast, Taylor's suit does not seek to enjoin any remediation efforts by Viacom. Nor has Viacom identified any specific remediation task that will be delayed or prevented, if Taylor's suit is successful. Taylor's suit is intrinsically one for cost recovery, not for injunctive relief. Therefore, the jurisdiction bar of section 113(h) does not apply, and Viacom's motion for summary judgment is unwarranted.

## CONCLUSION

Having considered the parties' arguments, and for the reasons discussed above, the Court finds that Viacom is not entitled to summary judgment. Even if the Court were to accept Viacom's argument that Taylor's cause of action is essentially a CERCLA cause of action, there is still a question of fact as to whether it should be treated as one for cost recovery or one for contribution under CERCLA. Viewing the facts in the light most favorable to Taylor, the Court must assume that it is one for cost recovery.

That being so, Viacom's attempt to apply the contribution bar to block Taylor's claim is inapt. Similarly, Viacom's attempt to apply the jurisdiction bar is unwarranted because the jurisdiction bar explicitly exempts causes of action for cost recovery. Therefore, Viacom's motion for summary judgment is **DENIED.**